**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

——————————————————————— x

POLYXENI (LINA) MOLOKOTOS-
LIEDERMAN,

          Plaintiff,

      v.

THANASIS MOLOKOTOS, DIANE
VARDAKAS MOLOKOTOS, HELEN
STASSINOPOULOS MOLOKOTOS, JAMES
SPANOS, and PENNY SPANOS,

          Defendants.

——————————————————————— x

Civil Action No.

**COMPLAINT FOR BREACH OF**
**FIDUCIARY DUTY, CONSTRUCTIVE**
**FRAUD, FRAUDULENT**
**CONCEALMENT, AND CONSPIRACY**

Plaintiff Polyxeni (Lina) Molokotos-Liederman ("Lina" or "Plaintiff") alleges the following based upon investigation by counsel, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

The investigation included, among other things, a review of Plaintiff's files, including email correspondence she received from and about Defendants and their agents over the past 25 years; the documents establishing and governing the trusts described herein; and publicly available information concerning Defendants and their agents and affiliates. Counsel believes that substantial evidentiary support for the allegations herein will be adduced after the opportunity for reasonable discovery.

## **INTRODUCTION**

1.      In Greek mythology, the story of the House of Atreus is nearly unrivaled for its duplicitousness, corruption, and malfeasance.

2.      Until the House of Molokotos. This Complaint tells a newer version of the same ancient tragedy, a family drama setting new lows for shameless familial betrayal, updated for newer audiences only by its more modern rationale: tax evasion and the use of a complex web of companies and deceits to defraud Lina.[1]

---

[1] In Greek legend, Atreus, a son of Pelops, was the King of Mycenae and the father of Agamemnon and Menelaus. But the descendants of Pelops were plagued by a curse pronounced by Hermes, the messenger God. After Atreus became king, his brother Thyestes contested his right to rule, and, out of spite, seduced Atreus's wife. When Atreus found out, he banished Thyestes from Mycenae. In response, Thyestes sent Pleisthenese, Atreus's biological son – whom Thyestes had raised as his own – to avenge him. Not recognizing Pleisthenese, Atreus killed him in self-defense. When Atreus learned Pleisthenese's identity, he duped Thyestes into returning to Mycenae, where he held a feast in Thyestes' honor. But at that feast, Atreus served Thyestes the flesh of his own sons, who Atreus had slain to avenge Pleisthenese.

Thyestes later conceived a son to avenge the betrayal. But in a cruel twist, Atreus married the mother of Thyestes' son, named Aegisthus, before Aegisthus was born, and Atreus raised him, not knowing that Thyestes was the true father. Years later, after Thyestes had been captured at Delphi

3.      This case arises from a complex, international scheme by which Plaintiff's family, including her mother Helen Stassinopoulos Molokotos, brother Thanasis Molokotos, and sister-in-law Diane Vardakas Molokotos (collectively, the "Molokotos Defendants"), have absconded with millions of dollars in assets placed into trust for Plaintiff's benefit.  The trustees of the trusts, James Spanos and his wife Penny (the "Trustees"), both close family friends with, and James as financial advisor to, Helen, allowed this misappropriation and misuse of trust assets through grossly negligent breaches of fiduciary duty.  Simply put, they were either complicit in the scheme or asleep at the switch the whole time.

4.      Lina[2] is the only daughter, and along with her brother, Thanasis, one of two children of Helen Stassinopoulos Molokotos and Michael Molokotos.  She is the beneficiary of a series of trusts granted by Helen and Michael in New York and governed by New York law.

5.      The first trust was created in February 2001.  It was made irrevocable in January 2015 through an amendment, and then two more irrevocable trusts were created in 2016.  The operative trust is the "2015" trust, which is placed in quotation marks because it was actually created in June 2016 and backdated to December 2015.  This "2015" trust is irrevocable, meaning all assets placed into it are Lina's and not her parents.

6.      These trust assets were held through a complex web of British Virgin Island ("BVI") companies, Delaware companies, and New York partnerships.  Diane, Helen's daughter

---

by Agamemnon and Menelaus and taken to Mycenae to be imprisoned, Atreus sent Aegisthus to murder him.  But Thyestes and Aegisthus recognized each other and united to kill Atreus, seize the throne of Mycenae, and drive Agamemmnon and Menelaus from the country.

[2] This Complaint uses the first names of the parties because multiple parties share the same last name.  No disrespect or informality is intended thereby.

in-law, has managed the BVI companies and has served as the sole director and shareholder of the onshore companies for decades.  She was placed in that role by Helen, not by the Trustees.

7.      Helen and Michael's estate is substantial, comprised of tens of millions of dollars in worldwide real estate holdings, investment accounts, gold, cash, and whatever items are contained in multiple Swiss safety deposit boxes.  Helen's maiden name is Stassinopolous.  The Stassinopolous family is even wealthier still, having founded a multi-billion dollar Greek manufacturing concern, Viohalco, that as recently as last year was responsible for approximately 8% of all Greek exports.

8.      The assets held in trust for Lina's benefit were also substantial, including millions of dollars of Park Avenue and Madison Avenue real estate in New York City, along with millions of dollars more in bank accounts, some held offshore in BVI and others held onshore with Citi Private Banking in the United States.

9.      But like Atreus, the descendants of Stassinopolous are too said to be cursed.  Unlike the House of Atreus, however, the Stassinopoulos curse involves a consistent pattern of multi-generational and inter-family conflicts over money and control of it.

10.     So Lina was never meant to actually receive any of the trust assets that had been granted to her by her parents.  This is because the trusts were actually set up as a complex means by which Helen could avoid Swiss taxes, by placing her assets in a foreign trust vehicle and thus decreasing the size of her Swiss taxes, both Swiss wealth tax and also Swiss income tax, the rate of which is determined by the magnitude of one's worldwide wealth.

11.     Moreover, the Molokotos Defendants have been overtly hostile to and distrustful of Lina because of her decision to marry a non-Greek and Jewish husband in 1994, to not baptize her son when he was born in 1998, and to raise her son outside of the Greek Orthodox Church.

The Molokotos Defendants have spent nearly thirty years segregating Lina financially from the family and scheming to deprive her of her inheritance rights as well as assets that should be owned by Lina outright.

12.     After parking the assets in trust and reaping the tax benefits, the Molokotos Defendants took every step necessary to make sure Lina would have to undertake the Herculean task of finding them (if she could even ever do so).

13.     Thus, over a five-year period starting in 2015, after the trusts were made irrevocable, the Molokotos Defendants misappropriated and removed millions of dollars in cash and other assets from the trusts, both directly and indirectly through the depletion of the trust assets, all to benefit and curry favor with Helen, who was one of the gatekeepers both to the Molokotos family fortune and to the Stassinopoulos family fortune.

14.     Diane was principally responsible for the intentional and bad faith removal of these assets. She is the sole officer, director, and manager of the operating companies held in the trust, and has exclusive access – and signatory power – to all of the bank accounts it holds. Diane also has been providing a management and oversight role of the offshore companies and bank accounts. Thus, she had the access and opportunity to do what she pleased with the trust assets and to ingratiate herself with her mother-in-law, Helen.

15.     These actions were carried out while each of the Molokotos Defendants owed Lina fiduciary duties of care, loyalty, and good faith, and while Lina reposed in them trust and belief that they would make decisions about Lina's assets with her best interests in mind. But rather than uphold the rule of law, the Molokotos Defendants acted with impunity.

16.     The Molokotos Defendants' bad faith and outright ugly conduct was only possible because the Trustees were either complicit in the scheme or asleep at the switch the whole time.

Despite being trustees of trusts governed by New York law, and owing Lina fiduciary duties of care, loyalty, and good faith, as well as the duty to manage the trust assets impartially and in the best interest of all beneficiaries, James and Penny were never appropriately or sufficiently involved in the administration of the trusts and either had no idea that the Molokotos Defendants were using them as their own personal piggy bank – or even worse, the Trustees were complicit in the scheme.

17.     According to Citi Private Banking, the only authorized signatory for the various trust companies is Diane.  From the beginning, James and Penny did not have access to any trust accounts and did not have signatory or information rights with respect to them.  James served as Helen's banker at Citi Private Banking in the US, so he helped establish these accounts.  As Penny writes in an email to Helen dated January 9, 2010: "It is the opinion of the attorney who has reviewed the Trust document on my behalf, that . . . I do not have a Financial Interest or signature or other authority over any asset associated with the Molokotos Family Trust . . . ."

18.     Indeed, in another damning revelation, James admitted to Lina – when asked directly by her in February 2022 about the status of the trusts and how the assets were being managed – that he had not been involved with or in management of the trusts at all in nearly six years.  During that time, the Molokotos Defendants had fleeced the trusts and removed assets.

19.     Diane's role as the key decision-maker makes a mockery of the notions of impartially and acting in the best interests of all beneficiaries to which all trustees of New York trusts are bound.  But for Diane, Helen could not have defrauded Lina.  But for Helen, Diane and Thanasis could not gain favor and influence over the Molokotos fortune and the Stasinopoulos fortune.

20.     In sum, this case has all of the elements of a classic Greek tragedy – deceit, self-dealing, the abuse of power, and the fraught relationship between mother and daughter.

Unfortunately for Lina, this case is cold reality, not myth, and the conduct described herein has cost Lina tens of millions of dollars, putting aside the non-monetary toll in mental anguish caused by her closest relatives' betrayal. Helen's tax evasion could have a direct impact on Lina, because under Swiss forced heirship rules, Lina would inherit both the assets and liabilities of her parents. And Lina, unlike the Molokotos Defendants, is rigorous about declaring and paying all her taxes. Where the Molokotos Defendants act with impunity, Lina acts in accordance with the rule of law.

21.     On these facts, Lina has a number of causes of action under New York and federal law. Lina seeks damages, disgorgement, declaratory relief and/or an accounting for, among other things, Defendants' breaches of fiduciary duty, constructive fraud, negligence, and pernicious and deceitful conduct that has deprived Lina of millions of dollars of assets that are rightfully hers.

## JURISDICTION AND VENUE

22.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332.

23.     Plaintiff and Defendants Thanasis Molokotos, Diane Vardakas Molokotos, James Spanos, and Penny Spanos are citizens of different states, and Defendant Helen Stassinopoulos Molokotos is an additional party who is a citizen of Switzerland.

24.     The matter in controversy exceeds $75,000.00 because it concerns the misappropriation, misuse, and deceit surrounding millions of dollars of trust assets.

25.     Jurisdiction is also proper under 28 U.S.C. § 2201 because this Complaint seeks, in part, a declaratory judgment.

26.     This Court has supplemental jurisdiction over all other claims in this Action under 28 U.S.C. § 1332(a), because such claims are so related to the other claims alleged that they form an integral part of the case and/or controversy.

27.     Venue is proper in this judicial district pursuant to 28 U.S.C § 1391 because a substantial part of the events giving rise to the claims occurred in New York City and a substantial

part of the property that is the subject of the action, including the trusts and all associated properties, are located herein.

28.     Moreover, the situs of the trusts is the State of New York and this action is brought under New York law.

**PARTIES**

**A.     Plaintiff**

29.     Plaintiff Lina Molokotos-Liederman is a natural person and citizen of, and domiciled in, the District of Columbia.

**B.     Defendants**

30.     Defendant Thanasis Molokotos is a natural person and citizen of the State of Connecticut.

31.     Defendant Diane Vardakas Molokotos is a natural person and citizen of the State of Connecticut.

32.     Defendant Helen Stassinopolos Molokotos is a natural person and citizen of Switzerland who is domiciled therein.  Helen executed certain of the trust documents described herein in New York, New York.  During the relevant time period, she had real property, bank accounts, and safe deposit boxes located in New York.

33.     Thanasis, Diane, and Helen are referred to herein as the "Molokotos Defendants."

34.     Defendant James Spanos is a natural person and citizen of the State of Connecticut. James is being sued in his capacity as trustee for trusts alleged herein.

35.     Defendant Penny Spanos is a natural person and citizen of the State of Connecticut. Penny is being sued in her capacity as trustee for the trusts alleged herein.

36.     Penny is, together with James, referred to herein as the "Trustee Defendants."

7

37.     The Trustee Defendants have a close personal relationship with the Molokotos Defendants.  James was Helen and Michael's former banker at UBS and then at Citi Private Banking, and James and Penny are long-standing family friends with Helen and Michael.  Indeed, Penny only served as the Trustee of the 2001 Trust (defined below) because James could not do so when he was serving as the family banker.

38.     As further detailed below, each of the Defendants committed the injurious conduct alleged herein in New York and specifically committed acts in New York that caused the harm to Plaintiff alleged herein.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A.     The Molokotos Family

39.     Lina is a naturalized United States citizen and beneficiary, along with her brother, Thanasis, of the Trusts.  She holds a Ph.D. in the Sociology of Religion and is trilingual in Greek, English, and French, and conversant in German.

40.     Lina is married to Carl Liederman, an American attorney and graduate of Yale Law School who, among other things, has served as a senior partner and head of practice of some of the US's leading law firms, as well as serving as trustee and chair for prominent charities for most of his 30-year professional career.  Carl is a native English speaker and is fluent in French.

41.     Lina and Thanasis's parents are Michael Molokotos and Helen Stassinopoulos Molokotos.  Each is a grantor of the Trusts.

42.     Michael was a successful Greek textile manufacturer whose family's industry trading name, Mallia Molokotou, was one of the most recognized brands in the country.

43.     Michael was born in Istanbul, Turkey and fled to Athens with his entire family when he was less than 5 years old.   He attended the German School in Athens and was thus fluent in German. He inherited the business from his own father, started working there at the age of 16,

and was responsible for greatly expanding the industry.  Michael eventually sold the company in 1992 when he was 63 years old.

44.     Because he did not speak English and only spoke rudimentary French and fluent German, Michael was only in charge of the Molokotos family's assets in Greece.  He began suffering from dementia in or around 2015, which developed into Alzheimer's Disease as of 2018.  Michael died in Switzerland in May 2022.

45.     Helen Molokotos (née Stassinopolous) is a Greek citizen who resides in Switzerland.  Helen manages the remainder of the Molokotos family's assets.  Helen is fluent in English and French, as well as her native Greek.  All key documents related to the Trust are in English, a language only Helen could understand (not Michael).  Helen's wealth either comes from Michael's business (since she worked for the company) or was inherited from her own parents.

46.     Helen's present worldwide fortune is considerable.  She owns between $45-50 million in Swiss real estate and other assets held in Switzerland,[3] most of which she inherited.  Her Swiss real estate assets on their own generate more than $1.2 million per year in rental income.  She also has owned, directly or indirectly, or has kept the lifetime benefit of, substantial properties in Canada, Greece, and the United States, and numerous cash and other liquid accounts held in multiple safety deposit accounts, which are not included in the $45-50 million estimate.  A handwritten "treasure map" prepared by Thanasis, without the knowledge or participation of Lina,

---

[3] This is based on the reported fiscal value of the Swiss properties in Helen's Swiss income tax return from 2021, which shows a fiscal value for real estate of approximately CHF 12.3 million and other reported assets in Switzerland of CHF 6.3 million.  The rule of thumb in Switzerland is to multiply the fiscal value of real estate by 3 to estimate market value, hence CHF 37 million (or approximately US$ 40 million based on current exchange rates) for the Swiss real estate.  The Swiss non-real estate assets declared on Helen's Swiss income tax return of 2021 comprise approximately CHF 5 million or US$5.4 million in cash as well as CHF 1.4 million or US $1.5 million of gold and jewels held in various Swiss safety deposit boxes.  These figures do not include the market value of her assets held, directly or indirectly, outside of Switzerland.

with some notations made by Helen detailing the Molokotos family assets, is appended hereto as **Exhibit A**.[4]

47.    Helen's father, Yannis Stassinopolous, founded (along with his brothers) Viohalco, a metal manufacturing conglomerate that is one of Greece's largest companies.   Viohalco is publicly listed on the Euronext Brussels stock exchange under the symbol "VIO:BR" and is responsible for approximately 8% annually of all Greek exports.   Helen's first cousins, Nikolaos (Nikos) and Evangelos Stassinopolous, now run Viohalco and are its largest shareholders.

48.    Consequently, the Stassinopolous family is among the wealthiest in the world, with a combined net worth of at least $1 billion, excluding any assets held offshore that are not declared.

49.    Like the mythical Atreus, the Stassinopolous family has had many intertwined conflicts, principally over money.

50.    Family conflicts over money proved to be so toxic that  Yannis, Lina's grandfather, sold his shares in the Company and moved to Switzerland with his wife Pauline (Lina), Lina's grandmother and namesake, in the 1960s.   Yannis eventually committed suicide in the 1970s because of the ongoing family crisis.   Pauline did not return to Greece for nearly thirty-five years (during the period from the 1960s to the mid 1990s).   This included missing her own husband's funeral.   Indeed, family relations must have been particularly poisonous for a Greek widow of a prominent industrialist to refuse to attend his funeral.

---

[4] Lina was not involved in the preparation of this "treasure map" and only received it during Thanasis' extramarital affair, described *infra*, when he was trying to prevent Diane from claiming certain assets in the event of divorce. It appears that Thanasis first prepared the map in 2007 or 2008, and updated it from time to time, again with Helen's notations and without Lina's participation or knowledge.  As Thanasis so artfully draws, the only way to follow the Molokotos fortune is to have a worldwide map, given how opaque the structure is.

51.     Thanasis is Lina's older brother.  He and his wife, Diane Vardakas Molokotos, reside in Connecticut.  Thanasis is Greek, Diane is Greek-American, and both are Greek Orthodox and have baptized both of their daughters in the Greek Orthodox Church.

52.     Thanasis is the Godson of Evangelos Stassinopoulos.  Evangelos is extremely secretive and extremely wealthy.  He has never married and has no known children, and thus no obvious legal heirs.  One of his gatekeepers to the outside world is Helen.  Thus, for Thanasis to remain close with and in the good graces of Evangelos, he needs to remain close with Helen.

53.     Because of Helen's close ties to the Stassinopoulos family, Thanasis was named a director to Viohalco on or around 2019 and also advises on Stassinopoulos family business.  In his role as a Viohalco director and family advisor, Thanasis earns more than $1 million annually.

54.     Not only is the Stassinopoulos family one of the world's wealthiest, they also appear prominently in the various data leaks on offshore companies as compiled by the International Consortium of Investigative Journalists.  Both Nikos and Evangelos appear in the Panama Papers leak.  In addition to the Panama Papers leak, Evangelos appears in the Paradise Papers leak and the Bahamas Papers leak.   When you click on the entities for Evangelos in particular, one enters a labyrinth of dozens and dozens of companies within companies across various offshore jurisdictions, a maze that would challenge Theseus to navigate.[5]

55.     On information and belief, Evangelos helped Helen in the structuring of the Trust companies, which mirror his own.  Evangelos and Nikos also co-invested with Helen in many of the assets that were held in the Trusts, so it is likely they wanted to keep the structure as opaque as possible, as in their other offshore holdings.

---

[5] https://offshoreleaks.icij.org/nodes/12107299.

56.     Diane is Thanasis's wife and Lina's sister-in-law.  Despite the fact that Diane has no training in real estate, law, or corporate governance, Diane has sufficiently ingratiated herself to the Molokotos and Stassinopoulos families to the point that she has managed Helen and Michael's United States-based and offshore assets for more than two decades, and is a key – if not the only – decision-maker with respect to those assets.

57.     Diane is Lina's fiduciary, and owes her duties of care, loyalty, and good faith. Diane has admitted to being Lina's fiduciary in writing, including by email dated March 4, 2022.

58.     This relationship arises from, among other things, Diane's role as an officer, director, and manager of certain companies within and related to the Trusts, which are described *infra*.

59.     Diane is also an advisor to the Stassinopoulos family.  On information and belief, she manages certain of Evangelos's offshore companies and investments.  Moreover, thanks to Helen, Diane acts as  a medical advisor and confidante to Evangelos and has become a gatekeeper herself.

60.     Between 2016 and 2018, Thanasis gambled with his marriage to Diane by having an extra-marital affair with a younger co-worker, Hemma Patel.  Eventually, Patel called off the affair and Thanasis and Diane reconciled in November 2018.

61.     During this affair, Thanasis relied on and confided in Carl and Lina for advice, support, and counseling.  This was an abrupt about-face in Thanasis's behavior, because he was hostile to Carl from the very beginning of the marriage and remained hostile for 25 years, until he needed Carl and Lina's support when he wanted to leave Diane.

62.     On the emotional side, Carl and Lina tried to do everything they could to protect Thanasis' health and wellbeing during his marital crisis.  Thanasis was in a very weak state and suffered from depression.  For this reason, Carl and Lina tried to be supportive.

63.     Thanasis also turned to Carl and Lina for practical and financial advice, as he wanted to protect his assets and those he would inherit in the event of a divorce from Diane. Thanasis shared for the first time information with Lina regarding the Molokotos family's assets and the existence of the 2016 trust.[6]

64.     Thanasis did so because he wanted Carl's advice on whether Diane had a legal claim to any of the assets in the Trust.  Carl explained that he is not a trust lawyer, but as a family member he had the impression that trust assets went to the grandchildren. When Thanasis heard this, he became quite agitated and informed Carl and Lina that he considered those assets his and not his daughters' and he did not intend to inform them of the trust.  Thanasis, like his mother Helen, wanted to keep as much as he could for himself.  By contrast, Carl and Lina said that they did not agree and intended to share all information with their son.

65.     Thus, but for Thanasis confiding this information during his affair, Lina would have never known that the Trusts existed and that Lina's family was squirreling away assets to which Lina had rights in a series of irrevocable trusts.

66.     The affair also helps to explain Diane's animosity towards Lina.  When Thanasis turned to Lina during the affair, Diane considered this as the ultimate betrayal by Lina.  As in any Greek drama, Diane's anger, jealousy, and desire for revenge is (at least in part) driving her actions, especially when she can enrich herself and her family at the expense of Lina and Lina's family.

---

[6] Thanasis sent to Carl and Lina the trust dated January 2016, and not the "2015" trust.  Neither Carl nor Lina even knew the "2015" trust existed until August 2022.

67. Diane certainly had the power to enrich herself at Lina's expense, especially for the critical time period between December 2015 and the present day, which overlaps considerably with Thanasis' affair with Hemma. Even before the affair, Diane also had spoken badly of Carl to Helen and Thanasis since the marriage in 1994, feeding the narrative of Carl as the "other" who could not be trusted.

68. Certainly, no member of the Molokotos Family ever voluntarily shared information with Lina regarding the Family's assets or the Trusts themselves until Lina managed to make certain grim discoveries for herself.

**B.      The Molokotos Family Trusts**

69. This case involves three different irrevocable trusts (the "Trusts"), for which Helen and Michael are grantors.

70. Because Lina was not informed of the Trusts' existence when they were formed, and Defendants actively tried to conceal from Lina the existence of the Trusts and Lina's interest in them, her understanding of the Trusts was and is based solely on recent email correspondence she has received from Defendants and their agents.

71. Lina was not specifically aware she was a beneficiary of the "2015" Trust (defined below) until August 2022. Michael and Helen were named as the beneficiaries of all prior during their lifetime, with the Trustee acting at the direction of Michael and Helen. The "2015" Trust, by contrast, deleted the provision in which Michael and Helen were beneficiaries and Lina and Thanasis thus became the direct beneficiaries as of December 2015.

72. On information and belief, the Trusts were created, and have been maintained at all times relevant hereto, by Helen and Michael (and, after his passing, solely by Helen) as a means by which to evade their tax obligations under Swiss law.

73.     Before they became Swiss citizens, Michael and Helen were on a forfait, which is a Swiss tax scheme for only the wealthiest families in which a family pays a lump-sum and the Swiss do not include worldwide assets in the estate for fiscal purposes.  On or around 2015, Michael and Helen came off the forfait in preparation for them becoming Swiss citizens in 2016. Thus, once the forfait ended, Michael and Helen became taxable in Switzerland on their worldwide assets, including those to which they had the benefit of use during their lifetime.

74.     Helen was fully aware of this, because she wrote in an email dated April 18, 2013 [all sic]: "Conclusion between the Swiss lawyers and Mr, Bricker [the Molokotos family's trust lawyer at Curtis Mallet].  Offshore companies that own real estate, can remain as they are, but of course declared to the Swiss authorities, That will be done next year, when we will change the status of forfait, to Swiss citizens.  For the offshore company Tsunami that holds bank accounts in New York and Canada, as well as the safe, they will rediscuss it."

75.     This is the  reason that the 2016 Trust was replaced by the "2015" Trust.  If Michael and Helen remained beneficiaries during their lifetime, all Trust assets would have to be declared in Switzerland, which would have increased both the wealth taxes and income taxes payable by Helen and Michael.  By taking certain of those assets and placing them into a trust for the benefit of others, Helen and Michael knowingly and intentionally tried to decrease the size of their estate and concomitant Swiss tax burden.

76.     The "2001 Trust" is a revocable trust governed by New York law dated February 9, 2001.  The 2001 Trust names Defendant Penny Spanos as Trustee and Michael and Helen as beneficiaries during their lifetime..  By a later-executed Deed of Appointment, James Spanos was named the Trustee, replacing Penny.  The 2001 Trust was executed in New York City.

77.     The 2001 Trust was subsequently amended on January 20, 2015.  Among other things, this amendment made the 2001 Trust Irrevocable.  The amendment was also executed in New York City.  The amended trust specified that Michael and Helen were beneficiaries during their lifetime.

78.     The "2016 Trust" is an irrevocable trust governed by New York law dated January 29, 2016.  The 2016 Trust names Defendant James Spanos as Trustee and Michael and Helen as beneficiaries during their lifetime and was executed in New York.  The Trustee claims that the 2016 Trust was never funded and that it was terminated on or about June 1, 2016.

79.     The so-called "2015 Trust" is an irrevocable trust governed by New York law executed on June 8, 2016 but backdated to December 15, 2015.  The 2015 Trust names Defendant James Spanos as Trustee and Lina and Thanasis as beneficiaries.  Because Lina understands the 2015 Trust to be the current operative trust, when this Complaint refers to capitalized "Trust" it is referring to the 2015 Trust, unless the context demonstrates otherwise.

80.     Neither Michael nor Helen are beneficiaries under the 2015 Trust during their lifetime, which is a fundamental change for purposes of Swiss tax law.  In short, Helen and Michael would have had to declare and pay Swiss wealth and income taxes on all trust assets if they remained beneficiaries of the Trust during their lifetime.  Because this is the only material provision that was changed from the 2016 Trust, it is clear that Helen and Michael did this to try and keep these assets outside of the Swiss tax net.  Helen and Michael's Swiss attorney, Ludovic Rais, appears as a witness to their signature for the "2015 Trust" and from the emails seen, Ludovic Rais was fully aware of the Trusts and the Swiss tax implications related thereto.  Helen also was fully aware, as her email of April 2013 clearly evidences in her own words.

81.     To the best of Lina's knowledge, the current operative Trust is the 2015 Trust.

82.     Even the process by which the Trusts were structured and amended leads to an inference that they were (and are) being used deceitfully and to hide assets.  In total, Helen and Michael created three "irrevocable" trusts, two of which – the 2001 Trust (made irrevocable in 2015) and the 2016 Trust – were actually revoked.  A third, the "2015" Trust, was created in 2016, but backdated without explanation.

83.     As detailed herein, the Defendants intentionally and/or negligently abused the Trusts to deceive and mislead Lina by absconding with millions of dollars in assets in which she had an interest before she ever learned of such assets' existence.

**C.     The Family's Hostility to Lina's Marriage Causes Distrust and Motivates Them to Disinherit Her**

84.     Defendants' misuse and misappropriation of Trust assets is a small part of their worldwide scheme to keep Lina from sharing in the family's money and property.

85.     The conduct has been ongoing for nearly thirty years.

86.     It stems, in part, from Lina's family's hostility to her 1994 marriage to Carl.

87.     This is because Carl was (and is) viewed as an "outsider" – he is Jewish and not Greek, and thus Thanasis, Diane and Helen (at the very least) have always been suspicious of his intentions.  Carl is the only non-Greek and Jew to have ever married into the Molokotos family.  Helen, early on in Lina's marriage, told Carl that it was difficult for her to have a Jew in the family, but that since Carl's family was of a higher socio-economic standing, especially when compared to Diane's, this made it easier for her.

88.     As Thanasis admitted to Carl and Lina during the period of his extra-marital affair, he, Diane, and Helen presumed – without any basis in fact – that Carl was after the Molokotos family's money, that his marriage to Lina would not last, and that as a result Carl, and by extension Lina, could not be trusted.

89.     Ironically, at the time of Carl and Lina's marriage, Helen cried poor and said that she could not afford the wedding.  For this reason, Carl's family paid for 50% of the wedding.

90.     This is unheard of among traditional Greek families.  When Helen married, she had a couture gown designed for her by the leading Athenian couturier and the dress was featured in a museum exhibition.

91.     But when Lina found a wedding dress she loved off-the-shelf from her favorite department store, Helen insisted that Lina go instead to the bargain basement Kleinfeld bridal warehouse in Brooklyn to find something cheaper.  Lina went to Kleinfeld and found many dresses, but none was less expensive, so Helen finally agreed to Lina's choice.  For her wedding gift, Helen gave Lina a set of pearl earrings, which turned out to be fake.  For a traditional Greek family like the Molokotos family, Helen's behavior towards her only daughter's marriage can only be described as unorthodox, and is in fact very revelatory of her cold and inappropriate behavior towards her own flesh and blood.

92.     In short, Carl was informed before his marriage to Lina that the Molokotos family fortune had been depleted, and he had assumed that the family jewels had likely been sold (because there is no other explanation for Carl's mother giving a valuable family heirloom to Lina while the mother of the bride (Helen) gives her own daughter Lina fake pearls).  Thus, it could not have been the case, as the Molokotos Defendants may falsely suggest, that Carl was a gold-digger in their midst.  Rather, he was a well-respected professional who was marrying out of love in 1994 and is still happily married to Lina nearly thirty years later.

93.     Curiously, if the Molokotos Defendants feared that Carl was after the money as early as 1994, there must have been money, just well hidden.  This indeed proved to be the case when, in 1997 (just three years later, and 11 years before Helen inherited from her own mother in

2008), Helen paid in cash nearly $800,000 to acquire a Park Avenue apartment through an offshore entity.

94.     Since 1994, Helen also lived a lavish life of concerts and fine restaurants, flying business class as she flitted across her various homes in Athens, the island of Spetses, the Upper East Side, and Geneva, Switzerland.

95.     Even more ironically, since their wedding, Carl has financially supported Lina and their son (including all of their son's substantial education expenses) fully and without any assistance from Lina's family.  Lina was not given anything in her own name after the marriage (rather assets held on her behalf were removed from her control).  By contrast, when Carl's grandmother died, she left Lina a considerable amount of jewelry, and all of Carl's and Lina's assets are held jointly, even those assets inherited from Carl's family.

96.     Separately, Helen has said that she cannot trust Lina because Lina and Carl did not baptize their son and raise him as a member of the Greek Orthodox Church.  Moreover, Helen believes that Carl, because of his faith, background and values, is more likely to "sell" assets than the Molokotos family is, because she believes the Molokotos family never sells, and holds on to, all of their real property and other assets.

97.     In contrast, Lina has reposed substantial trust and belief in each member of her family (including Helen, Thanasis, and Diane), believing – wrongly – that they had her best interests at heart and would safeguard assets in which she had an interest, but over which they had oversight and control.  Lina also has trusted Helen when she gave a power-of-attorney in Greece to Helen and when Lina relinquished her rights to two valuable properties in Athens, Greece in favor of Thanasis, relying on Helen's promise to leave more to Lina in Switzerland (as detailed below in Part I, *infra*).  Lina trusted her family to inform her of anything that concerned her or to

19

which she had a legal right.  Lina could not imagine that her family was capable of such betrayal, hence her good faith trust in them.

98.     As detailed below, Lina had no choice but to place such trust in her closest family members, including her sister-in-law, Diane, because her family as well as Diane controlled assets (purportedly) for the benefit of Lina, and Lina was simply unaware of what was being done and how it was being managed, and that she was the actual beneficiary currently, not Helen, until recently.

99.     To the extent Lina was aware of any Molokotos family trust before August 2022, she assumed the Trust did not concern her.  She was told and thus led to believe that the Trust's assets were Helen's, and that Diane was "helping" on the accounting side and on managing the tenancies of the rented properties in New York.

**D.     The Assets Known to Be in the Trust, and Those Believed to Have Been Removed From It**

100.     Despite repeated efforts and persistent questions, none of the Defendants nor their agents has ever confirmed to Lina with specificity which Molokotos family assets are held in the Trusts.

101.     Neither Lina nor any of her heirs or beneficiaries has ever received a distribution from any of the Trusts.

102.     Based on representations made to her by Thanasis (when he confided in Carl and Lina during his affair), Lina understands that the Trust holds, at least, three apartments in a building at 900 Park Avenue in New York (the "Park Avenue Apartments") as well as a fifty-percent stake in a commercial property located at 1343 Madison Avenue in New York (the "Madison Avenue Store").

103.    The Park Avenue Apartments are units 16A, 4B, and 16B.  In particular, 16A is a large, two-bed, two-and-a-half bath unit that is worth more than $2 million and was worth approximately $3 million at the top of the market in 2021.

104.    This property is held by an operating company, Kovac Corporation ("Kovac"), a Delaware corporation.  Diane is Kovac's president, general secretary, and sole director.

105.    Kovac is in turn held by an offshore holding company located in the British Virgin Islands, called CCD BVI.

106.    Kovac's interest in the Madison Avenue Store is by virtue of its 50% ownership of a New York partnership, Kovnor Associates, which owns the store.  Diane is Kovnor's president, general secretary, and sole director.  Kovac is Kovnor's managing partner.

107.    Thanasis provided Lina with a sketch of these assets in a  handwritten note drawn by Diane, which is reproduced below.  The dotted line denoted "Trust" indicates the assets held by it:



108.    The sketch also references a Delaware entity, Bramley Investment Limited ("Bramley"), which owns the other half of the Madison Avenue Store and which is itself 50% owned by Lina and Thanasis.  Bramley is not a part of the Trust.

109.    On information and belief, the Trust also held substantial additional assets beyond the Park Avenue Apartments and Madison Avenue store.

110.    In the January 29, 2015 amendment to the 2001 Trust, Helen and Michael provided that each of Lina and Thanasis' children would receive $1 million in cash upon reaching thirty years old.  This $3 million was funded "from the trust."  At the time, the oldest grandchild was twenty-five years old.

111.    Thus, as of that date, the Trust was sufficiently liquid to fund a $3 million distribution of cash in less than five years.

112.    Moreover, the accounts for both Kovac and Kovnor are held with Citibank Private Banking (the "Citi Accounts").  The minimum balance required to open and maintain such accounts is at least $5 million.

113.    This further indicates that there were substantial liquid assets held by the Trusts after their inception.  Otherwise, Defendants could not have opened and operated the Citi Accounts for at least seven years – after December 2015, when the Trust became irrevocable.

114.    In addition, and on information and belief, the Trust also held, and may still hold, an entity called Tsunami, which holds bank accounts in the BVI, Canada, and the United States, that themselves have at least $3.5 million in value, as well as safe deposit boxes with Citi Private Banking in New York.  This information and belief is based, at least in part, on the "treasure map" attached hereto as **Exhibit A**, which discloses (on the bottom left hand side of the page) that

Tsunami BVI is "in trust" and then references the Molokotos family's former Trust attorney at Curtis Mallet ("Bricker").

115.    Thus, on information and belief, the Trust held – in addition to the Park Avenue Apartments and the Madison Avenue Store – at least $5 million in liquid accounts, and likely much more, when accounting for the Tsunami assets and others of which Lina is still unaware.

**E.    Thanasis, Diane, and Helen Misappropriate Trust Assets**

116.    Thanasis, Diane, and Helen, working duplicitously and in concert, have actively depleted these assets held by the Trust since it was made irrevocable in December 2015.  These transfers, and Defendants' bad faith conduct, violated the terms of the Trusts, statutory and common law, and basic notions of fairness, candor, and care.

117.    At least $5 million has been improperly removed from the Trust since that December 2015.

118.    Each Molokotos Defendant had the opportunity and ability to do so, and as detailed above and further below, each of Helen (directly) and Thanasis and Diane (both in terms of payments received and indirectly in gaining favor and influence over Helen) have repeatedly sought to enrich themselves to the detriment of Lina.

119.    Because each of Thanasis and Lina have equal rights to Helen and Michael's estate, Thanasis and Diane opportunistically viewed the Trust assets as "zero sum," and thus any dollar taken away from Lina became an additional dollar for Thanasis (and his wife, Diane).

120.    On information and belief, the Molokotos Defendants also funneled assets out of the Trust so Helen could avoid Swiss wealth taxes and higher Swiss income taxes.  Diane participated at several meetings with Helen and Michael's trust counsel at Curtis Mallet regarding the Trusts, including the 2015 Trust, and email correspondence indicates actual knowledge by Diane of the potential Swiss tax liabilities.

121.    At the time each Molokotos Defendant improperly removed assets from the Trust, each bore a fiduciary duty of care, loyalty, and good faith for Lina's benefit.

122.    By virtue of her position as manager of Kovnor and Kovac, and sole signatory on all Trust-related accounts, Diane was principally responsible for removing Trust assets.

123.    Diane was (and remains) the managing agent and sole decision-maker with respect to all Trust assets.  She had (and still has) full access to all accounts related to the Trust, including the Citibank Accounts, and sole signatory authority.

124.    Diane used that access and unchecked authority to improperly and without legal basis or justification deplete the Trust, without Lina's knowledge and for the specific purpose of enriching herself, Thanasis, and Helen, at Lina's expense.

125.    Diane, at the behest and with the assistance of Thanasis, used multifarious methods to deplete Trust assets.

126.    For instance, and on information and belief, Diane  improperly paid or transferred to Helen hundreds of thousands of dollars, including in the form of "consultancy fees."

127.    One manner in which Diane and Helen conspired to abscond with such fees is especially telling.

128.    Helen and Michael used Park Avenue Apartment 16A for their own exclusive benefit during the relevant time period, including after December 2015, when the Trust became irrevocable and thus Apartment 16A ceased to be their property.

129.    After December 2015, Helen and Michael signed a sixteen week "lease agreement" for the use of Apartment 16A.  They were required to pay rent under the lease agreement, but that rent would be immediately returned to them, by Diane, in the form of a consultancy fee Helen and Michael received.  Indeed, the duration of the lease agreement – sixteen weeks – provides further

evidence of how Helen created sham documents to avoid taxation because  Helen would become subject to federal, New York State and New York City taxation if she spent more than sixteen weeks in the United States.

130.    The rent ranged from $18,000 to $30,000 per year for an apartment that would rent out at $18,000 to $30,000 *per month*.  The "rent" was clearly not market-based or negotiated on an arms-length basis.  Ironically, Lina, as an actual beneficiary, had the full right to use Apartment 16A, not Helen.  And yet, for the entire time her parents owned apartment 16A from 1997 and especially after the "2015" Trust, Helen told Lina, Carl, and their son that 16A was "my apartment" and Helen left firm instructions with the superintendent of 900 Park Avenue to not permit anyone to use or enter the apartment without her permission.

131.    Because the carrying costs for 16A were so high, all the rents earned from the other Trust assets (16B, 4B, and 50% of the Madison Avenue store), went to subsidizing Helen's personal use of 16A, and yet even this was insufficient to cover these expenses.  Helen did all this knowing that she had no legal right to use 16A as the way she did.  Helen did all this knowing that her use of the Trust assets would subject her to Swiss tax law, and yet she did not declare them.

132.    In short, Helen knowingly and intentionally committed tax evasion through the use of the Park Avenue Apartments, aided and abetted by Diane, Thanasis, and the Trustees.

133.    Helen renewed the lease on 16A in January 2021, in the middle of Covid – and while her home-bound, 92-year old husband Michael lay bedridden with dementia in Geneva, Switzerland – for an additional five (5) year term.  Helen conspicuously terminated the lease agreement in May 2022, only soon after Lina had been informed by the Trustees that the Trust was irrevocable and the Park Avenue Apartments were being held for Lina and Thanasis' benefit, at which point Lina realized that they had been improperly used exclusively by her mother.

134.    Diane also collected a periodic fee directly from the Trust, purportedly for managing the assets therein, which she has been collecting for decades now.

135.    There was no basis for Diane to collect such a fee, especially after December 2015. She was not the Trustee, so she had no legal right to take fees.  Moreover, and as detailed herein, Diane was not fulfilling any fiduciary obligations to Lina (or her assets) and thus had no entitlement to any fee paid directly to her by Lina.

136.    On information and belief, Diane also removed assets from the Trust by taking cash directly out of Trust operating accounts and moving it to separate accounts and/or locations under her control and/or the control of Thanasis or Helen.

137.    Helen also removed assets from the Trust by taking cash directly from the operating accounts associated with the Trust, either on her own or through Diane.

138.    She did so both before and after the Trust was made irrevocable.

139.    Helen also effectively depleted Trust assets by using Park Avenue Apartment 16A for her own benefit after the Trust was made irrevocable.

140.    Had Apartment 16A been rented, and based on prevailing market rates, it would have generated at least $1 million in net income for the Trust over the past six years.  By improperly using the Apartment as her own, even though it was not, Helen deprived the Trust, and Lina, of this market rent.  Further, had the rents from the other properties not been used to subsidize Helen's use of 16A, the net proceeds would have accumulated and made interest, all of which was depleted from the Trust given Helen's personal use of 16A.

141.    Helen knew she was removing money from the Trust after it was made irrevocable, and knew that she could not do so, given the nature of the Trust arrangement at that time.  Helen also knew that Lina, Thanasis, and their respective children could use 16A with the consent of the

Trustee.  But the Trustee was nowhere to be found; there was just Helen, deceiving and benefitting personally, ignoring the terms of the Trust, lying to her daughter Lina, and knowingly evading Swiss taxes.

142.    Diane and Thanasis were aware of this conduct and actively assisted and/or knowingly received the direct and indirect benefits of it.

**F.    Lina Begins to Uncover Misconduct With Respect to the Trust, and the Molokotos Defendants Try to Force Her to Sign an Improper and Overbroad Release to Insulate Themselves**

143.    Lina only began to uncover Defendants' improper, tortious and bad faith conduct with respect to the Trust in February 2022.

144.    During a telephone conversation between Lina and Thanasis, with Diane listening and participating in the background, Thanasis disclosed that the Trust was in continued significant financial difficulties, including because – according to Thanasis – the COVID pandemic had caused rental income to deteriorate.  At this point in time, Lina did not know that she was a beneficiary of the Trust with ownership rights to Kovac and Kovnor.  Helen had always told Lina that they were Helen's properties .

145.    Thanasis further disclosed that he and Diane had made the unilateral decision to transfer the proceeds from the Madison Avenue Shop – 50% owned by Bramley, in which Lina has a 50% interest – to Kovac and Kovnor to cover losses in the Trust and increase liquidity.

146.    Lina immediately objected to this diversion of assets, explaining that Thanasis and Diane did not have a right to decide on how Lina's share in Bramley was allocated.  Nonetheless, Thanasis and Diane diverted thousands of dollars in cash from Bramley to the Trust, over Lina's objection.

147.     This dispute led to weeks of vitriol and aggression from Thanasis, who – without basis (and despite being the aggressor himself) – accused Lina of dividing and destroying the Molokotos family.

148.     Thanasis informed Helen of the dispute within 24 hours of his conversation with Lina, falsely accusing Lina and Carl – "her lawyer husband" – of making "legal threats."

149.     In response, Helen sent Lina an email, dated February 28, 2022, which admitted to certain of the Molokotos Defendants' misconduct with respect to Lina's rights in the Trust.  Helen conceded that Lina was "right to feel left out" of the family's business and that Helen "underst[ood Lina's] anger."

150.     Helen admitted that Lina was "not informed in detail about the . . . Trust, expenses, income, debts, etc."  Helen acknowledged these were "serious omissions."  Helen also admitted that while Lina and Thanasis should have the "same right" "in the Trust," they had not actually been treated equally.

151.     Moreover, Helen conceded that Diane, and not the Trustees, was managing the Trust's assets, suggesting that "an accountant recommended by [James] Spanos take over" from Diane and that Diane should "hand over all the paperwork [concerning Trust accounts and property] with explanations."

152.     That same day, Lina and Carl contacted James, because they understood the Trust to be irrevocable, and thus (rightly) assumed that the only person with any decision-making authority would be the trustee.

153.     During this phone call, however, James candidly admitted that he had not been involved in the Trust in at least six years.  This was so despite the fact that James was the designated

Trustee and had concomitant fiduciary duties of care, loyalty, and good faith as a result.  By sitting idly by and ignoring those duties, James plainly violated them.

154.    This conduct was grossly negligent and reckless in its indifference to the obligations borne by a trustee of a New York trust, Lina's best interests, and basic considerations of good faith and reasonableness.

155.    Shocked by the disclosure that the Trustee Defendants had been derelict and not involved in any Trust management, Lina was then contacted by Michael Schwartz ("Schwartz"), an attorney at the Curtis Mallet firm that had helped Helen and Michael create the Trusts.  During the first call, Schwartz introduced himself as the lawyer for Michael and Helen.  He then corrected himself and said he was the lawyer for the Trust.  When Lina asked if he was the lawyer for the beneficiaries, Schwartz said he would need to come back to her and then later informed her that he was actually representing James as the Trustee.

156.    After a series of conferences and seriatim correspondence with Schwartz and James, the Defendants – behind all the manipulation around the Trusts – decided to close down shop before their scheming was uncovered, thus communicating to Lina their recommendation to liquidate the Trust and sell each of the Park Avenue Apartments and the Madison Avenue Store.

157.    During this time, Lina's father Michael passed away in May 2022, which was emotionally difficult for Lina.  In spite of his death, Thanasis continued to harass Lina and Carl, pressuring them to  meet together (without James) to resolve the Trust matter.  Lina and Carl explained repeatedly that no member of the family had decision-making power; only the Trustee had decision-making power and the authority to decide.

158.    Thanasis said on several occasions that James was useless (using a far more vulgar string of expletives) and an idiot, and that he and Lina had to meet because only the family could

decide. Carl and Lina refused any such meeting because, again, only the Trustee could decide matters for the Trust under New York law. In the days leading up to the funeral and even at the funeral, Thanasis continued to pressure and harass Lina and Carl, without success.

159.    Before James agreed to liquidate Trust assets, however, he boldly insisted that Lina execute a release to absolve him of any liability and to fully indemnify him for his tenure as Trustee.

160.    This was shocking to Lina. First, it was apparent that James had not actually taken any affirmative actions as Trustee. Thus, it was not clear what he would be liable for in his role, besides his glaring inaction.

161.    Moreover, the form of waiver, release, and indemnification James asked Lina to sign was overbroad, inappropriate, and itself further indicative of Defendants' bad faith.

162.    For example, Lina was not just asked to release the Trustees. Instead, and without explanation, she was asked to also indemnify and hold them harmless in both their individual and personal capacities.

163.    In addition, the release did not only pertain to James and Penny in their role as Trustees. It also sought broad releases, indemnifications, and hold harmless agreements, for each of the Molokotos Defendants in their individual capacities. There could be no legitimate reason to do so, other than on information and belief to transfer all liabilities (including any Swiss tax liability) onto Lina.

164.    Moreover, the release contained dozens of pages of self-serving recitals that sought to whitewash Defendants' historical misconduct. There was also no legitimate reason for a simple release, relating to the sale of Trust property and dissolution of same, to contain such a self-serving and detailed narrative.

165.    The release also sought to bargain away Lina's rights to a judicial accounting with respect to the Trust.  Among other things, the release sought a waiver of any obligation of James and Penny to "provide any further or additional information or accountings as to all or any of their acts or transactions" from the date the 2001 Trust was created onward.

166.    Plainly, Defendants were seeking to avoid a full and complete – or any – accounting of the Trust before dissolving it precisely because they had something to hide.  They also wanted to shift liability from themselves (the perpetrators) onto Lina (the victim).

167.    Smelling a rat, Lina refused to sign the release.

**G.      In Violation of their Fiduciary Duties, the Trustees Fail to Stop Thanasis, Diane and Helen from Improperly Removing Assets from the Trust**

168.    A trustee of a New York trust owes each of the beneficiaries of the trust fiduciary duties of care, loyalty, and good faith, as well as the duty to act with impartiality and in the best interests of all beneficiaries.

169.    That means, at a bare minimum, the trustee must safeguard the assets held by the trust from mismanagement, theft, and misappropriation.

170.    These duties also encompass a basic standard of care by which a trustee must manage such assets.  That standard includes the obligation to manage the beneficiary's assets as a prudent person would in the management of his own property.

171.    Despite those fiduciary duties and basic standard of care, James and Penny did not prevent the Molokotos Defendants from depleting the Trust and misappropriating Lina's property for their own improper uses.

172.    This is because, in effect, James and Penny were "trustees in name only."

173.    Put simply, James and Penny did not manage the Trust assets, and in fact were not involved at all with the Trust during the relevant time period.

174.   Thus, far from exercising any prudent standard of care, James and Penny did not take any actions whatsoever with respect to the Trust or the management and maintenance of its assets.

175.   James has admitted to Lina that since the "2015" Trust was formalized, he was not involved with the administration of it at all until Lina contacted him for an explanation on what was the Trust, what assets did it contain, who were the beneficiaries, and why the Trust was in a significant loss position in February 2022, with years of unpaid taxes.

176.   This is a greater than six-year period during which the trustees for the Trust were absent.  This absence allowed the Molokotos Defendants to exercise singular control over the Trust and its assets and operate with impunity in connection therewith.

177.   Among other things, the Molokotos Defendants were able to move money and other assets in and out of the Trust, use Trust assets for their own benefit, and conceal their behavior from Lina.

178.   Indeed, in response to inquiries from Lina about the bank accounts associated with Kovnor and Kovac, Citi Private Banking confirmed that Diane was the only authorized signatory for the trust companies, and that only she had information rights in connection with them.  Citi Private Banking also confirmed that the accounts required at least $5 million to be on the private banking platform.

179.   Consequently, James and Penny never had signing authority or information rights about two of the companies at the heart of the Trusts for which they were trustees.  This is a profound and inexplicable dereliction of duty.

180.   Indeed, even allowing Diane to have sole signatory authority with respect to Trust assets is a violation of the Trustees' fiduciary duties.  When a trustee delegates an investment or

management function to a third party, the trustee must exercise care, skill and caution in selecting a suitable delegate, the scope and terms of the delegation and periodically review the delegee's exercise of the delegated function and compliance with the delegation.  Allowing Diane to be the only signatory for the account and failing to review the function delegated to her was a clear violation of fiduciary duty.

181.    Furthermore, before February 2022 when Lina proactively contacted them, James and Penny had never contacted Lina to update her on any Trust, or even inform her she was a beneficiary of the original Trust, the 2015 Trust or the 2016 Trust.  The failure to do so violated the Trustees' fiduciary duties, because a Trustee is required to keep all beneficiaries reasonably informed and thus cannot act in good faith without disclosing the existence of the trust to its beneficiaries.

182.    Had James or Penny behaved consistent with their fiduciary duties or followed the requisite standard of care, they would have informed Lina she was a beneficiary of the Trusts and ensured she received full and complete disclosure about the assets the Trusts held and a complete accounting in connection with those assets.

183.    When they did share information about the Trusts with Lina and Thanasis, however, James and Penny did so asymmetrically.  For example, James and Penny always communicated with Diane (and Thanasis) about Trust matters first, before communication with Lina.

184.    This was imprudent.   It would have been reasonable and appropriate to communicate with each beneficiary at the same time.  By sharing information with Diane and Thanasis before doing so with Lina, James and Penny showed clear favoritism for one beneficiary over the other.  This violated the Trustees' duties of impartiality.

185.    Indeed, as described below, the Trustees still refuse to provide basic disclosure about the Trusts and their assets, despite Lina's repeated, direct inquiries to them.  This too violated the Trustees' fiduciary duties and demonstrated that the Trustees were not acting in good faith.

186.    This conduct, including glaring *non*-conduct, dereliction of duty and complete disregard for the Trusts and for Lina, was reckless and in bad faith and continues to this day.  At a minimum, it was grossly negligent with respect to Lina and the assets of which she is a beneficiary.

### H.    Lina Searches for Answers, but Defendants and Their Agents Stonewall and Refuse to Provide Any Details

187.    Lina's attempts to secure any detailed information about the Trusts, the assets they hold and have held, and the conduct of any of the Defendants in this case, have been repeatedly stymied.

188.    On multiple occasions over a one-year period, Lina has asked the Molokotos Defendants and the Trustees to provide a full and complete disclosure of the assets held by the Trusts.

189.    They have never done so.

190.    For example, Lina has repeatedly asked which persons were involved in managing Trust assets since inception, because the Trustees by their own admission were not.

191.    No one – not the Defendants nor the Curtis Mallet attorneys nor any of their agents – has ever answered the question.

192.    Similarly, Lina has repeatedly asked for full and complete bank statements and an accounting of what happened to the funds flowing through the Trust since it was made irrevocable. She has never received a direct response to this question nor has she received any full and complete bank statements (just extracts with transaction details and/or cover pages conveniently missing), even despite multiple direct requests by Lina to Citi Private Bank in December 2022.  Rather,

Defendants through their agents have dissembled and said that Lina should rely on Diane – not the Trustees – while Diane has dissembled and said that Lina should rely on the bankers for account information.

193.    Diane has never provided complete and comprehensive account information for Kovac, Kovnor, or any property or asset that currently is or was held in the Trust.

194.    Further demonstrating their refusal to give Lina even basic information about the Trust and its assets, Defendants and their agents have not provided any update to Lina for many months preceding the filing of this suit.  Diane even threatened to demand personal indemnification for any legal and accounting fees in fulfilling Lina's legitimate and reasonable information requests, and that was merely for Bramley, a company in which Lina is a 50% shareholder.

195.    The silence by all (the Trustees and their counsel, the bankers, Diane, the accounting firms) is, in a word, "deafening," and suggests something more nefarious.

196.    It is particularly telling because in June 2022, in response to a request from Lina and after she refused to sign the release, Curtis Mallett and James promised to have a formal judicial accounting prepared and filed with the New York Surrogate's Court to provide more disclosure of and information concerning the Trusts and their assets.

197.    To date, that accounting has not been prepared or filed.

198.    On information and belief, this representation was made to Lina solely to placate her and frustrate her information and other rights with respect to the Trusts, and it was done at the behest of the Molokotos Defendants; worse, it was done to induce her to avoid pursuing other rights and remedies available to her, such as instituting this action (which she had no other choice but to pursue as a result of Defendants' stonewalling and other improprieties).

I.    **Defendants' Attempts to Misappropriate Lina's Assets in Greece and Switzerland Illustrate Their Intent to Disinherit Her**

199.    Defendants' malfeasance with respect to the Trusts is merely the tip of the iceberg.

200.    Indeed, it is a small part of a worldwide scheme to remove any assets in Lina's name and to disinherit Lina from the Molokotos family estate and shift nearly all of those assets from Lina to Thanasis and Diane (and their heirs).

201.    As noted above, most of Helen and Michael's wealth is held in properties in Switzerland and Greece.

202.    To wrongly and intentionally deprive Lina of her rights to own outright certain Greek properties, Helen asked Lina to sign a power-of-attorney in 1998 and then again in 2004. Helen (falsely) represented to Lina that the document would only be used for Lina's benefit to assist with tax filings and administrative tasks in Greece since Lina did not live there.  Based on and acting in reliance on these representations, and fully trusting her mother, Lina executed the powers-of-attorney.

203.    In contrast, and from a simple administrative delegation, these documents comprised an overbroad and unlimited-in-time power of attorney in Greece over all of Lina's assets, including over any gifts or inheritance or any property left to her or in her name (collectively, the "PoA").

204.    Unbeknownst to Lina, Helen abused her power under the PoA to put Lina's vacation home in Spetses, Greece into Helen's name as "usufruct" property, a civil-law property right that removes the asset from Lina's outright direct ownership and thus from Carl and Lina's marital property and gives Helen the right under law to use these properties and derive benefit from them during her lifetime.

205.    When Lina first discovered this, Lina was shocked and horrified, because Helen had "gifted" the shell of the house and Carl and Lina spent several hundred thousand dollars of Carl's money to outfit the house and garden.  Carl and Lina even notified the "gift" to the IRS, as required under US tax law, although Carl and Lina now know that no gift was ever made and that such IRS filing was not only unnecessary, but now impacts the taxation of the asset when and if sold.

206.    When Lina confronted Helen, Helen claimed that the notary made a mistake, and it would be fixed, which statement was plainly false and misleading.  A few years later, Lina discovered that Helen had taken out a mortgage on the Spetses house in 2004 for Euro 100,000, and when Lina inherited Euro 100,000 from her paternal grandmother in 2008, Helen abused her power under the PoA to transfer that money to pay off the mortgage.   In sum, Lina and Carl paid for the Spetses house, and yet Helen ensured that it would not be in their name, abusing her power under the PoA.  During the family crisis in 2022, Helen finally admitted to Lina that Helen put the Spetses house in Helen's name as a usufruct from the beginning to prevent it from being sold, because "Carl and his people like to sell."

207.    Moreover, Helen abused her power under the PoA to keep the proceeds of an apartment in (Esperides) Kifisisia, Athens, which was in usufruct and thus owned by Lina with Helen having the benefit of the rent during her lifetime.  Under Greek law, when a usufruct property is sold, the majority of the proceeds go to the outright owner, in this case Lina.  Helen would only be entitled to the value of her lifetime benefit, which is typically the net rent she could have achieved.  By abusing her power under the PoA, Helen kept all of the proceeds for herself and has – for at least ten years – refused to return them to Lina, even though Lina is entitled to that

money under law and has explained repeatedly that the money would be used to pay for her son's college and law school education.

208.    Helen's conduct in Switzerland has been even more egregious.

209.    Switzerland has forced heirship laws that prevent children from being disinherited. During the relevant time period, Helen has ensured that all family assets are in her name, not in Michael's name to ensure that she inherits as much as possible.

210.    Michael's holographic (hand-written) will, done in 2001, left everything to his wife during her lifetime (which typically is only used when the surviving spouse is in financial need, given Swiss forced heirship rules).  This means that each of Thanasis and Lina own 50% of the principal and Helen has the right to the interest or rent during her lifetime.  What is revelatory is that Michael's will was in French and handwritten by Michael, when he could have written it in German which he spoke fluently.[7]  This further indicates that Helen was the architect of a scheme to defraud Lina.  Michael had no ability on his own to understand what he was writing because he did not speak or read French.  Rather, he relied wholly on Helen and her advisors to tell him, even when he was writing something by hand.  Further, at the time the Trusts were made irrevocable in 2015, Michael was already showing signs of dementia and he was diagnosed with Alzheimer's in 2018, permitting Helen to act as she wanted and to secure more for herself and within her sole control.  Michael in any event only spoke rudimentary English and could not understand what he was being asked to sign independently.

211.    In Switzerland, the heirs inherit both the assets and the liabilities so each heir has the right to ask the court for a formal accounting of the estate, which is what Lina did.  Lina is a

---

[7] A Swiss holographic will can be written in any language and does not need to be notarized to be valid.

Swiss taxpayer and thus must report any wealth, including inherited wealth.  Because she had no

idea what assets were Michael's and had no idea if what he had was fully tax compliant, Lina

exercised her right to request a formal accounting, which the Geneva *Justice de Paix* accorded.

212.    Lina also called a family meeting to find a path forward to see what assets there

were, what needed to be declared to the tax authorities, and to try and separate any shared

ownership.

213.    At this meeting, Helen's Swiss lawyer Ludovic Rais informed Lina that Helen had

amended her will and disinherited Lina, leaving her only the statutory minimum under Swiss law,

which is currently 12.5% of the declared estate.  This conduct has cost Lina at least $20 million in

inheritance of family assets in Switzerland, excluding the properties in the US, Greece, and

offshore..

214.    Helen took advantage of Michael's declining mental cognitive state and his

inability to read the key legal documents by shifting all of his assets to her name and taking out

two mortgages in their joint name – in 2017 and 2020 – worth more than $1 million, according to

their 2021 Swiss income tax returns.  This left Michael's share of the estate with no assets and

potentially substantial debts when he died.  The day after Lina tried to find a path forward, Helen

had her accountant inform the court-appointed notary that CHF 1.4 million in gold and valuables

listed in Michael's name in their 2021 Swiss income tax return was an error and that it had to be

corrected and put in Helen's name.

215.    One result of this intentional and malicious conduct – itself a callous display of

elder abuse – was to effectively disinherit Lina, who stood to inherit 50% of Michael's estate upon

his death (as well as disinheriting Lina from Helen's estate).  In fact, on or around 2018 or 2019,

Helen told Lina that she had Michael sign a document to transfer his financial ownership in their

joint bank accounts (and safety deposit boxes) to "protect the assets" from any potential misuse by Michael given the rapid deterioration of his cognitive health.  Because Michael's mental health started to decline on or around 2016, on information and belief Helen made every effort to secure as many assets as possible and transfer them to her name during this time period to protect them for herself, because under Swiss law and according to Michael's will, 50% of Michael's assets would go to Lina and 50% to Thanasis, with Helen only having the lifetime benefit.  In short, the more Helen could control, the less Lina would inherit.

216.    Instead, Lina has inherited nothing from Michael, except possibly debt and a small amount of cash.

217.    As further evidence of the connection between the Swiss malfeasance and Helen's abuse of Trust assets, Lina was informed by Helen's Swiss lawyer, Ludovic Rais, that everything would be fixed – including that Helen would pay Lina the money she owed her for the Greek assets, Helen would reinstate Lina's rights to both Michael and Helen's estate, Helen would enter into a legally binding agreement to divide the Swiss properties between Lina and Helen, and Helen would correct for the unequal treatment in allocations to date.

218.    But there was one condition: Lina had to sign the waiver and release referenced above in connection with the Trusts, which as detailed *supra* was filled with misrepresentations and drafted to cover the Defendants' tracks.  Lina informed Ludovic Rais and the Trustees in November 2022 that she would not sign a false document and be complicit in tax evasion.  Her primary concern was ensuring that anything she inherited, anything that she has a legal right to, must be fully tax compliant.

219.    Lina has not heard from Swiss counsel or the Trustee since, and neither has she received any replies to her information requests to Citi Private Banking, among others, as well as

any material updates from the Trustee or its counsel.  The Swiss judicial proceeding to determine the estate is ongoing.

220.    Helen's self-serving conduct, aided and abetted by the Defendants and even their advisors, was undertaken for the same principal reason that Helen has participated in malfeasance with respect to the Trust – it benefitted Helen and is intended to reduce her tax burden, all at Lina's expense.

221.    For Lina, the saddest part is that Helen (her mother) has treated Michael (her father) as a non-entity – as a man who produced nothing, who owned nothing, and who left nothing.

222.    Michael's fifty years of tireless work, building a well-respected and successful textile industry, and the love and respect people had for Michael, are being washed away, so that Michael becomes a shell, like one of Helen's offshore companies.

223.    To dishonor the memory of Michael, after more than six decades of marriage – all in the name of money – is shameful, beyond being unlawful when carried out in this manner.

## COUNT I

### For Breach of Fiduciary Duty and Constructive Fraud
### (Against All Defendants)

224.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

225.    As trustees to the Trusts, Jim and Penny were Lina's fiduciaries and bore Lina a fiduciary duty of care, loyalty, and good faith, as the duty to act with impartiality and in the best interests of all beneficiaries.

226.    The Trustee's actions outlined herein breached the duties of care, loyalty, and good faith, as well as their duty of impartiality.  As set forth herein, and among other things, Jim and Penny were totally derelict in their duties to manage the assets of the Trust in the best interests of Lina, one of its beneficiaries.   The Trustees were reckless and or grossly negligent.  They were

not involved with the Trusts at all between the date the "2015" Trust came into force and early 2022, during which period the Molokotos Defendants misappropriated and misused Trust assets. Indeed, Jim and Penny did not even have access to the accounts holding Kovnor and Kovac's assets and had no information rights with respect to those Trust companies.

227.    The Molokotos Defendants would not have been able to fleece the Trust had the Trustees fulfilled their duties.

228.    The Trustees' actions herein also violated their fiduciary duties because they failed to keep Lina reasonably informed about the status of the Trusts, including the very fact that she was a beneficiary of them, and failed to share basic information about what assets the Trusts hold. James in particular has refused to answer direct questions about what assets are held in Trust, and has affirmatively and intentionally frustrated Lina's attempts to gather information.

229.    By recklessly and with gross negligence failing to manage Trust assets and prevent their misuse and depletion, James and Penny have unfairly harmed Lina and failed to act in her best interests.

230.    Thanasis, Diane and Helen were also Lina's fiduciaries and bore Lina a fiduciary duty of care, loyalty, and good faith.  Lina reposed her confidence in the Molokotos Defendants and, as a result, each of these Defendants was in a position of superiority and influence in relation to her.  Lina relied on each of the Molokotos Defendants, and each exercised de facto control and dominance over Lina's relationship with the Trust.

231.    Thanasis and Helen's fiduciary relationship is amplified by their familial relationship with Lina.  As a result, Lina justifiably trusted and relied on Thanasis and Helen, who were in a position of superior knowledge with respect to the Trust and the family's assets.

232.     Diane has admitted that she owed Lina a fiduciary duty of care, loyalty, and good faith by virtue of her position as an officer, manager, and director of Trust companies, including Kovac and Kovnor, as well as Bramley, which Lina owns 50% of but which she never controlled, managed, or operated in any way.

233.     The Molokotos Defendants' actions described herein breached their duties of care, loyalty, and good faith to Lina.  As set forth herein, among other things, the Molokotos Defendants acted disloyally and in bad faith by intentionally misappropriating and misusing Trust assets, to enrich themselves at Lina's expense.  The Molokotos Defendants also conspired to prevent Lina from discovering she was the beneficiary of the Trust and learning the extent of assets in which she is entitled to share.  This was done out of spite and to punish Lina for, among other things, marrying a non-Greek and Jewish spouse and raising her son in a manner her brother and mother did not approve of.

234.     The Molokotos Defendants' actions described herein also violated their duty of candor to Lina.  As Lina's fiduciaries, the Molokotos Defendants owed Lina a duty of candor, to not use their superior knowledge of the family's assets to mislead her.  Rather than abide by these duties, the Molokotos Defendants' direction of and participation in a scheme to misappropriate Trust assets wrongfully utilized their position of superior information and knowledge to deceive and confuse Lina about the family's assets and her rights in connection therewith.

235.     By manipulating the Trust's assets to wrongfully keep them away from Lina in bad faith, as well as other intentional and bad faith conduct and actions outlined here, the Molokotos Defendants have unfairly harmed Lina and acted solely to advance their own self-interest.

236.     The circumstances surrounding the misconduct outlined herein were such that Lina did not know, and could not with reasonable diligence have known, of Defendants' misconduct.

Lina was not aware she was a beneficiary of the Trust until August 2022, and thus did not discover, and could not have reasonably discovered, the misconduct alleged herein until that date at the earliest.

237.    Lina suffered damages by reason, and as a direct and proximate result, of Defendants' breaches of their fiduciary duties, in an amount to be determined at trial, but believed to be at least $5 million.

## COUNT II

### Fraudulent Concealment by a Fiduciary
### (Against Thanasis Molokotos, Diane Vardakas Molokotos, and
### Helen Stassinopoulos Molokotos)

238.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

239.    Thanasis, Diane and Helen were Lina's fiduciaries and bore Lina a fiduciary duty of care, loyalty, and good faith.  Lina reposed her confidence in the Molokotos Defendants and, as a result, each of these Defendants was in a position of superiority and influence in relation to her. Lina relied on each of the Molokotos Defendants, and each exercised de facto control and dominance over Lina's relationship with the Trust.

240.    Thanasis and Helen's fiduciary relationship is amplified by their familial relationship with Lina.  As a result, Lina justifiably trusted and relied on Thanasis and Helen, who were in a position of superior knowledge with respect to the Trust and the family's assets.

241.    Diane has admitted that she owed Lina a fiduciary duty of care, loyalty, and good faith by virtue of her position as an officer, manager, and director of Trust companies, including Kovac and Kovnor, as well as Bramley, which Lina owns 50% of but which she never controlled, managed, or operated in any way.

242.    The Molokotos Defendants' actions described herein concealed numerous material facts from Lina.  For instance, these Defendants never disclosed to Lina that she was a beneficiary

of the 2015 Trust, despite the fact that they discussed with her assets that had or could have been in the Trusts.  Furthermore, the Molokotos Defendants falsely stated and represented to Lina that she and Thanasis were treated equally in the Trusts, despite the fact that Thanasis had – along with Diane and Helen – actively removed assets to his benefit and Lina's detriment.

243.   The Molokotos Defendants also concealed their misappropriation of Trust assets by blaming the lack of Trust monies on COVID-related problems with the real estate market, when the actual cause of the Trust's funding issues was Defendants' intentional and knowing misuse and transfer of those assets out of the Trust.

244.   The Molokotos Defendants' actions described herein were intentional in order to mislead Lina.  The conduct described herein is part of a decades-long campaign to disinherit Lina. It was done intentionally and with knowledge.  The Molokotos Defendants have admitted to not trusting Lina because of her marriage to Carl and their decisions around raising her son, and the actions described herein were motivated, at least in part, by this distrust.  Moreover, Defendants malfeasance with respect to the Trusts is a small part of their worldwide efforts to disinherit her, which further supports an inference of intentional concealment with respect to Trust assets.

245.   Lina's reliance on the Molokotos Defendants' actions, statements, and omissions was reasonable and justifiable under the circumstances.  Each are members of her family who, until recently, she had no reason to distrust.  Lina therefore had no reason to doubt that Defendants were truthful and forthright in their representations and actions.  Moreover, Diane in particular was responsible for managing the family's U.S.-based and offshore assets, which position made her inherently trustworthy to Lina, who did not have any specific personal knowledge about those assets and therefore had to rely on Diane for information about them.

246.    Furthermore, to the extent that the Molokotos Defendants omitted to disclose material facts to Lina, she is not required to plead or prove the element of reliance, because reliance on an omission is presumed.

247.    The circumstances surrounding the misconduct outlined herein were such that Lina did not know, and could not with reasonable diligence have known, of Defendants' misconduct. Lina was not aware she was a beneficiary of the Trust until August 2022, and thus did not discover, and could not have reasonably discovered, the misconduct alleged herein until that date at the earliest.

248.    Lina suffered damages by reason, and as a direct and proximate cause, of Defendants' fraudulent concealment, in an amount to be determined at trial, but believed to be at least $5 million.

249.    The Molokotos Defendants acted with willful, reckless, and/or callous disregard for Lina's rights and with fraud and/or malice towards her, thereby entitling Lina to the award of punitive damages at trial in accordance with the proofs.

## COUNT III

### For Conspiracy
### (Against Thanasis Molokotos, Diane Vardakas Molokotos, and
### Helen Stassinopoulos Molokotos)

250.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

251.    As detailed above, *see supra* ¶¶ 224-237, Lina has alleged that the Molokotos Defendants breached their fiduciary duties and fraudulently concealed and omitted to disclose material facts.

252.    The Molokotos Defendants made a corrupt agreement between and among themselves to carry out such tortious conduct.  Indeed, such conduct would not have been possible

without the overt and understood agreement to do so, because it involved decades-worth of efforts, in numerous different jurisdictions, to disinherit Lina and deprive her of family assets.

253.    The Molokotos Defendants' actions described herein demonstrate numerous overt acts in furtherance of that agreement.  For example, each Defendant removed assets from the Trust, including by simply transferring millions of dollars out of Trust-related accounts without Lina's knowledge of such conduct.

254.    The Molokotos Defendants' actions described herein were intentional in support of their scheme.  The conduct described herein is part of a decades-long campaign to disinherit Lina. It was done intentionally and with knowledge.  The Molokotos Defendants have admitted to not trusting Lina because of her marriage to Carl and their decisions around raising her son, and the actions described herein were motivated, at least in part, by this distrust.  Moreover, Defendants' malfeasance with respect to the Trusts is a small part of their worldwide efforts to disinherit her, which further supports an inference of intentional concealment with respect to Trust assets.

255.    Lina suffered damages by reason, and as a direct and proximate result, of Defendants' conspiracy, in an amount to be determined at trial, but believed to be at least $5 million.

## COUNT IV

### For Aiding and Abetting Breach of Fiduciary Duty
### (Against Thanasis Molokotos and Helen Stassinopoulos Molokotos)

256.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

257.    This cause of action is brought in the alternative to the direct claims of breach of fiduciary duty against Thanasis and Helen.

258.    By reason of the conduct described herein, Diane was Lina's fiduciary who breached her duties of care, loyalty, and good faith to Lina.

259.    By reason of the conduct described herein, Thanasis and Helen affirmatively assisted Diane in her breaches of fiduciary duty.  Thanasis and Diane concealed facts from Lina, including that Trust assets were being diverted out of the Trust and to Helen by Diane, as well as the fact that Helen was misusing the Park Avenue Apartments.  Moreover, Thanasis and Helen failed to act to prevent Diane's improper conduct and self-dealing even though they had an obligation to do so.

260.    This substantial assistance was a but-for and proximate cause of Lina's harm, which itself was a direct and reasonably foreseeable result of Thanasis' and Helen's conduct.  Thanasis and Helen had knowledge of the Trust and its assets, and understood that it was irrevocable and thus that Lina was a direct beneficiary of it.  Their knowing participation in Diane's scheme to fleece the Trust led directly to Lina's losses, because Diane would never have been able to misappropriate Trust assets without Helen receiving such assets and Thanasis acting as a go-between with Lina.

261.    Lina suffered damages by reason, and as a direct and proximate result, of Defendants' breaches of fiduciary duty as aided and abetted by Thanasis and Helen, in an amount to be determined at trial, but believed to be at least $5 million.

### COUNT V

**For Negligent Misrepresentation**
**(Against Thanasis Molokotos, Diane Vardakas Molokotos, and**
**Helen Stassinopoulos Molokotos)**

262.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

263.    This cause of action is pled in the alternative to the claims for fraudulent concealment by a fiduciary alleged herein against the Molokotos Defendants.

264.    By reason of the conduct described herein, the Molokotos Defendants made misrepresentations and/or concealed or failed to disclose material facts about the Trust's assets,

Lina's rights therein, and the underperformance of the Trust.  These false and misleading statements were made directly to Lina in response to Lina's requests that each of these Defendants confirm and verify, among other things, what assets are in the Trust and the specific contours of her rights in connection with them.

265.    In making each of the misstatements set forth herein, the Molokotos Defendants failed to act with the prudence required of a reasonable person in each of their respective positions, and each was otherwise careless and/or reckless in making material statements of fact to Lina to induce her non-action in connection with the Trusts.

266.    Each of the Molokotos Defendants had a duty of care and a special relationship with Lina.  Thanasis, Diane and Helen were Lina's fiduciaries and bore Lina a fiduciary duty of care, loyalty, and good faith.  Lina reposed her confidence in the Molokotos Defendants and, as a result, each of these Defendants was in a position of superiority and influence in relation to her. Lina relied on each of the Molokotos Defendants, and each exercised de facto control and dominance over Lina's relationship with the Trust.

267.    Thanasis and Helen's fiduciary relationship is amplified by their familial relationship with Lina.  As a result, Lina justifiably trusted and relied on Thanasis and Helen, who were in a position of superior knowledge with respect to the Trust and the family's assets.

268.    Diane has admitted that she owed Lina a fiduciary duty of care, loyalty, and good faith by virtue of her position as an officer, manager, and director of Trust companies, including Kovac and Kovnor, and Bramley, which Lina owns 50% of but which she never controlled, managed, or operated in any way.

269.    Lina actually relied on the Molokotos Defendants' statements and omissions of fact.  Lina's reliance on the Molokotos Defendants' actions, statements, and omissions was

reasonable and justifiable under the circumstances.  Each are members of her family who, until recently, she had no reason to distrust.  Lina therefore had no reason to doubt that Defendants were truthful and forthright in their representations and actions.  Moreover, Diane in particular was responsible for managing the family's U.S.-based and offshore assets, which position made her inherently trustworthy to Lina, who did not have any specific personal knowledge about those assets and therefore had to rely on Diane for information about them.

270.    Furthermore, to the extent that the Molokotos Defendants omitted to disclose material facts to Lina, she is not required to plead or prove the element of reliance, because reliance on an omission is presumed.

271.    Lina suffered damages by reason, and as a direct and proximate result, of Defendants' negligent misrepresentations, in an amount to be determined at trial, but believed to be at least $5 million.

### COUNT VI

**For Mismanagement of Trust Assets**
**(Against James Spanos and Penny Spanos)**

272.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

273.    As trustees for the Trusts, Jim and Penny were Lina's fiduciaries and bore Lina a fiduciary duty of care, loyalty, and good faith, as well as the duty to act with impartiality and in the best interests of all beneficiaries.

274.    The trustees owed a duty to Lina to manage the assets of the Trusts as fiduciaries and in Lina's best interests.  This included the obligation to manage Lina's assets as a prudent man would in the management of his own property.

275.    By reason of the conduct set forth herein the Trustees failed to conform their actions to their fiduciary duties and this standard of care in managing the Trust's assets.  As set forth

herein, and among other things, Jim and Penny were totally derelict in their duties to manage the assets of the Trust in the best interests of Lina, one of its beneficiaries.   The Trustees were reckless and or grossly negligent.   They were not involved with the administration of the Trusts at all between late 2015 and early 2022, during which period the Molokotos Defendants misappropriated and misused Trust assets.   Indeed, Jim and Penny did not even have access to the accounts holding Kovnor and Kovac's assets and had no information rights with respect to those Trust companies.

276.   The Molokotos Defendants would not have been able to improperly and in bad faith remove assets from the Trust if the Trustees had fulfilled their duties.

277.   The Trustees' actions herein also violated their fiduciary duties and were not prudent because they failed to keep Lina reasonably informed about the status of the Trusts, including the very fact that she was a beneficiary of them, as well as basic information about what assets the Trusts held.   James in particular has refused to answer direct questions about what assets are held in Trust, and has affirmatively and intentionally frustrated Lina's attempts to gather information.

278.   By recklessly and with gross negligence failing to manage Trust assets and prevent their misuse and depletion, James and Penny have unfairly harmed Lina and failed to act in her best interests.

279.   Lina suffered damages by reason, and as a direct and proximate result, of Defendants' mismanagement of trust assets, in an amount to be determined at trial, but believed to be at least $5 million.

## COUNT VII

### For Declaratory Judgment
### (Against All Defendants)

280.   Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

281.     Lina is a beneficiary of the Trusts as outlined herein.

282.     As a result, she is entitled to a full and fair disclosure of and distribution from the assets that are currently in, and were previously held by, the Trusts.

283.     These include, among others, Kovac, Kovnor, the Park Avenue Apartments, the Madison Avenue Store, and any and all monies that are currently or were previously held in the Trust, which amounts are believed to be at least $5 million more than the Trust's current assets.

284.     These assets were, among other things, mismanaged, misappropriated, and misused by Defendants, with either the intent to defraud and mislead Lina or gross negligence and/or recklessness.

285.     The purposes and intentions of the Trusts have been defeated and such purposes and intentions are not being, and never were, executed or performed.

286.     Helen and Michael created and maintained the Trusts as a means to improperly avoid and minimize their Swiss tax obligations, not to legally and in good faith provide a vehicle to hold estate assets for the benefit of their descendants.

287.     Lina seeks a judicial declaration that Defendants improperly absconded with and misappropriated Trust assets that were rightly hers, in an amount to be determined at trial but presently believed to be no less than $5 million.

288.     An actual case or controversy exists between Lina and Defendants regarding the identity of the operative Trust, if any, as well as Lina's ownership rights and interest in that Trust. Accordingly, the declaratory relief sought is justiciable.

<u>**COUNT VIII**</u>

**For Equitable Accounting**
**(Against James Spanos and Penny Spanos)**

289.     Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

290.    Lina is a beneficiary of the Trusts and as such has a right to demand an accounting from her Trustees.

291.    Lina is entitled to an equitable accounting to require James and Penny to demonstrate what was done with property of the Trust, which is in turn Lina's property, as well as a full and complete disclosure of what assets are both presently and have ever been held in the Trust.

292.    Lina had a fiduciary relationship with James and Penny at all relevant times, because each was designated as a trustee of the Trusts.

293.    By virtue of that relationship, Lina entrusted to James and Penny the duty to manage the Trusts and all assets held thereby.

294.    By virtue of the conduct alleged herein, James and Penny abused their fiduciary relationship with her, failed to act in Lina's best interests, and violated their fiduciary duties of impartiality and good faith.  Lina will not be able to uncover the extent of James and Penny's grossly negligent and/or reckless conduct without an accounting.

295.    Lina is further entitled to an accounting under New York statutory law as an interested person.

296.    Lina has made a demand for an accounting to James and Penny, and such demand has been refused.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.    Awarding compensatory damages in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon, but believed to be no less than $5 million;

B.      Awarding Plaintiff punitive damages for Defendants' intentional, malicious, willful, and wanton conduct, as detailed above;

C.      Awarding Plaintiff her expenses, attorneys' fees for Defendants' bad faith and intentional fraudulent concealment, and costs, as alleged in Count II above; and

D.      Awarding Plaintiff such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury for all issues so triable.

DATED:  February 27, 2023                    **ROLNICK KRAMER SADIGHI LLP**
                                             STEVEN M. HECHT
                                             BRANDON FIERRO
                                             1251 Avenue of the Americas
                                             New York, NY 10020
                                             Telephone: (212) 597-2800
                                             shecht@rksllp.com
                                             bfierro@rksllp.com


                                             _____
                                             STEVEN M. HECHT

                                             *Counsel for Plaintiff Lina Molokotos-Liederman*