UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/14/2023
```

POLYXENI (LINA) MOLOKOTOS-LIEDERMAN,

                 Plaintiff,

         - against -

THANASIS MOLOKOTOS, et al.,

                Defendants.

**23 Civ. 1654 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiff Polyxeni (Lina) Molokotos-Liederman ("Plaintiff" or "Lina") brings this action against defendants Thanasis Molokotos ("Thanasis"), Diane Vardakas Molokotos ("Diane"), Helen Stassinopoulos Molokotos ("Helen" and together with Thanasis and Diane, the "Molokotos Defendants"), James Spanos, and Penny Spanos (together with James Spanos, the "Spanos Defendants," and collectively with the Molokotos Defendants, "Defendants"). Plaintiff alleges that Defendants misappropriated and misused assets held in a trust for Plaintiff's benefit. To redress the alleged wrongdoing, Plaintiff states multiple causes of action against Defendants. Among other claims, Plaintiff asserts breach of fiduciary duty, constructive fraud, fraudulent concealment, and conspiracy. Plaintiff seeks monetary damages, including compensatory and punitive damages.

Now before the Court are Defendants' pre-motion letters to dismiss[1] Plaintiff's Amended Complaint (see "Amended Complaint," Dkt. No. 28), submitted via email to Chambers on May 25, 2023, pursuant to Federal Rules of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") for lack of subject matter jurisdiction, 12(b)(3) ("Rule 12(b)(3)") for improper venue or forum, and 12(b)(6) ("Rule 12(b)(6)") for failure to state a claim. (See "Letter Motion," Dkt. Nos. 35-1, 36-1.) Upon completing the pre-motion letter exchange, the parties consented to the Court deeming the pre-motion letters a fully briefed motion, as stated below, and the Court therefore construes the Letter Motion as a motion to dismiss. For the reasons set forth below, Defendants' Letter Motion is **GRANTED**, in part, and **DENIED**, in part.

## I. <u>BACKGROUND</u>

A.   <u>FACTUAL BACKGROUND</u>[2]

This case is about a family's alleged misappropriation of assets held in a trust for another family member's benefit.

---

[1] The Court notes that as of the date of this Decision and Order, Helen Molokotos, despite being named a defendant, has not entered an appearance in this matter. Thus, while references to the Molokotos Defendants or Defendants, collectively, include Helen Molokotos, she has not joined in the motion to dismiss, as she has not formally appeared.

[2] The factual recitation set forth below, except as otherwise noted, derives from the Amended Complaint, and the facts pleaded therein, which the Court accepts as true for the purpose of ruling on a motion to dismiss. <u>See</u> <u>Dane v. UnitedHealthcare Ins. Co.</u>, 974 F.3d 183, 188 (2d Cir. 2020) (noting that on a motion to dismiss, a court must "accept as true all factual allegations and draw from them all reasonable inferences"

Lina is the daughter of Michael Molokotos ("Michael") and Helen Molokotos. Michael was a successful Greek businessman in the textile manufacturing industry. He inherited his father's business, whose trading name, Mallia Molokotou, has become one of the most recognized brands in Greece. Helen resides in Switzerland and likewise comes from a wealthy Greek lineage, the Stassinopoulos family, which has a combined net worth of at least $1 billion. Until his death in May 2022, Michael was in charge of the Molokotos family's assets in Greece, while Helen managed the family's remaining assets located in other parts of the world.

Lina is a naturalized United States citizen residing in Switzerland. She alleges that her residence in Switzerland is "on a temporary basis," and that she is, in fact, domiciled in Washington, D.C. (Amended Complaint ¶¶ 41-42.) Lina is married to Carl Liederman ("Carl"), an American practicing attorney, and together, they have one son, Alexander. Thanasis, Lina's older brother, is married to Diane Vardakas Molokotos. Diane is Greek-American and has not only managed Helen and Michael's U.S.-based and offshore assets -- many of which are held in the trusts at issue here -- for over twenty

---

(internal quotation marks and citation omitted)). Except where specifically quoted, no further citation will be made to the Amended Complaint or the documents referred to therein.

years, but she has also been a key decisionmaker with respect to those assets.

There are three trusts of relevance in this case -- one created in 2001 (the "2001 Trust"), one created in January 2016 (the "2016 Trust"), and one created in June 2016 but backdated to December 2015 (the "2015 Trust"). The 2001 Trust is a revocable trust naming Michael and Helen as beneficiaries during their lifetimes, and Penny Spanos as trustee. Penny Spanos and her husband, James Spanos, are family friends of Helen's, and James also served as Helen's financial advisor. James later replaced Penny as the named trustee of the 2001 Trust, and on January 20, 2015, the 2001 Trust was amended and made irrevocable.

The 2016 Trust, which was dated January 29, 2016, named Michael and Helen as beneficiaries during their lifetimes, and named James Spanos as trustee. However, according to James Spanos, the 2016 Trust was never funded and was terminated on or about June 1, 2016.

The 2015 Trust, which is the current operative trust, is an irrevocable trust executed on June 8, 2016, but backdated to December 15, 2015. Unlike the two previous trusts, the 2015 Trust named only Lina and Thanasis as beneficiaries and named James Spanos as trustee (the "Trustee"). Plaintiff contends that the 2015 Trust named Lina and Thanasis as

4

beneficiaries instead of their parents because it allowed Michael and Helen, who became Swiss citizens in 2016, to avoid certain tax obligations under Swiss law.

Though Penny Spanos was not named a trustee of the 2015 Trust, Plaintiff also alleges that Penny was essentially a "de facto Trustee" as she was actively involved in managing and administering the Trust.[3] (Id. ¶ 175.) The 2015 Trust assets, purportedly held for Lina's and Thanasis's benefit, comprise millions of dollars in New York real estate and millions of dollars in bank accounts, both domestic and offshore.

Between 2016 and 2018, Thanasis had an extramarital affair. Thanasis sought advice from Lina and Carl about whether, in the event of his divorce, Diane would have any claim to the 2016 Trust, which was ultimately never funded and later terminated. It was only through Thanasis reaching out to Lina that she learned about the 2016 Trust's existence, which sparked the chain of events that led her to learn of the 2015 Trust. Lina did not become aware that she was a beneficiary of the 2015 Trust until August 2022. Plaintiff notes that to the extent she was aware of any family trust

---

[3] As the causes of action in this matter pertain primarily to the 2015 Trust, the "Trust" hereinafter shall refer to only the 2015 Trust, unless otherwise indicated.

before August 2022, she did not know that she was directly affected as a beneficiary.

Plaintiff alleges that the Molokotos Defendants intentionally concealed the existence of all the trusts from Lina in order to deprive her of her interest in the assets. Lina claims that starting in February 2022, she began to learn about Defendants' wrongdoing with respect to the trusts. Eventually, through discussions with family members and the Trustees, Plaintiff uncovered that the Molokotos Defendants were attempting to disinherit her from the Molokotos family estate and shift the 2015 Trust assets to Thanasis and Diane.

According to Plaintiff, the Molokotos Defendants' behavior in excluding her from enjoying a share of her family's property and wealth had been occurring for nearly thirty years, since her marriage to Carl, who her family considered an "outsider" as he is both Jewish and non-Greek. (Id. ¶ 107.) Given Carl's outsider status, Lina's family had difficulty trusting him -- and by extension, Lina -- believing that he "was after the Molokotos family's money, [and] that his marriage to Lina would not last[.]" (Id. ¶ 108.) Amidst this turbulent backdrop, Thanasis confided in both Carl and Lina about his affair, which Lina alleges precipitated Diane's resentment towards Lina and gave her more reason to financially enrich herself at Lina's expense.

Plaintiff alleges that she believes the Trust holds significant assets that are being misappropriated and misused by the Molokotos Defendants, and their misconduct is being facilitated by the Trustees, James and Penny Spanos. According to Lina, she and Carl communicated with James and Penny Spanos regarding her concerns about her interest in the 2015 Trust. Though James admitted to not being actively involved in overseeing the 2015 Trust as Trustee, Penny, who Lina alleges served as the "de facto Trustee," was present on every call Lina had with James. (Id. ¶ 174.) Penny was purportedly actively involved in managing and administering the Trust despite not being a trustee in name. Lina also alleges that both James and Penny Spanos as Trustees violated their fiduciary duties in failing to protect the 2015 Trust from the Molokotos Defendants' improper removal and use of Trust assets.

The assets held in the Trust include at least three apartments (the "Park Avenue Apartments") in a building in New York and a fifty-percent stake in a commercial property (the "Madison Avenue Store") in New York. Based on publicly available records, Plaintiff learned that one of the Park Avenue Apartments was sold on April 13, 2023, for approximately $2.2 million, but Lina asserts she was neither consulted nor informed of the sale.

Of particular relevance is that the Park Avenue Apartments are owned by Kovac Corporation ("Kovac"), an operating company of which Diane is president, general secretary, and sole director. In turn, Kovac is held by an offshore holding company based in the British Virgin Islands. Kovac also has fifty percent ownership of Kovnor Associates ("Kovnor"), a New York partnership, which owns the Madison Avenue Store. Diane is Kovnor's president, general secretary, and sole director.

Plaintiff alleges upon information and belief that the 2015 Trust held or holds substantial additional assets beyond the apartments and commercial building. Yet, despite being named a beneficiary of the 2015 Trust, Lina alleges that neither she nor her heirs or beneficiaries have received any distribution from the Trust.

In sum, Plaintiff asserts that Defendants worked in concert to misappropriate assets in the 2015 Trust by actively depleting it -- to the tune of at least $5 million -- since December 2015 for their own benefit and to Plaintiff's detriment. Lina also alleges that the Molokotos Defendants diverted assets from the Trust in order to avoid Swiss taxes, and that Diane, given her positions in Kovnor and Kovac, and as the sole signatory on Trust-related accounts, was responsible for removing those assets. Plaintiff asserts

claims for breach of fiduciary duty, constructive fraud, fraudulent concealment, and conspiracy against Defendants.

B.   <u>PROCEDURAL HISTORY</u>

Plaintiff initiated this action on February 27, 2023. Consistent with the Court's Individual Practices, the parties exchanged pre-motion letters regarding Defendants' anticipated motion to dismiss, and Plaintiff filed an Amended Complaint. On May 24, 2023, Plaintiff filed a letter requesting a case management conference to address the alleged ongoing depletion of Trust assets while this matter is pending. (<u>See</u> Dkt. No. 34.)

Again, consistent with the Court's Individual Practices, on May 25, 2023, Defendants filed pre-motion letters regarding their anticipated motion to dismiss the Amended Complaint for lack of subject matter jurisdiction, improper venue, and failure to state a claim. (<u>See</u> Letter Motion; "Molokotos Ltr. Motion," Dkt. No. 35-1; "Spanos Ltr. Motion," Dkt. No. 36-1.) The following day, Defendants filed their opposition to Plaintiff's request for a case management conference. (<u>See</u> Dkt. Nos. 35, 36.)

On June 1, 2023, Plaintiff filed a pre-motion letter, opposing the grounds for Defendants' anticipated motion to dismiss and responding to their opposition to the conference. (<u>See</u> "Pl. Opp. Ltr.," Dkt. No. 39.) Defendants then filed

their pre-motion letter replies to the Court, indicating that the parties were unable to resolve their issues with the Amended Complaint without resorting to motion practice. (See "Molokotos Reply Ltr.," Dkt. No. 41; "Spanos Reply Ltr." Dkt. No. 42.)

Subsequently, the Court held a case management conference on June 9, 2023 in order to address Plaintiff's concern that Defendants will deplete and misappropriate Trust assets to Plaintiff's prejudice during the pendency of this action and her request for limited discovery on the matter. At the conference, the Court decided that the threshold issues of subject matter jurisdiction and venue needed to be resolved before determining whether limited discovery on the depletion of Trust assets was appropriate. The parties briefly presented their arguments on venue and subject matter jurisdiction, and the Court scheduled an evidentiary hearing for June 23, 2023 to allow the parties to examine Lina and Carl in order to determine whether Lina was domiciled in Switzerland or Washington, D.C., for the purpose of establishing subject matter jurisdiction based on diversity.

At the June 23, 2023 hearing, the parties presented evidence and examined Lina and Carl on the witness stand. The parties further consented to the Court's deeming the pre-motion letters regarding Defendants' anticipated motion to

dismiss a fully briefed motion and requested additional briefing. On July 5, 2023, Plaintiff and the Molokotos Defendants filed supplemental letters in support of their positions. (See "Pl. Supp. Ltr.," Dkt. No. 46; "Molokotos Supp. Ltr.," Dkt. No. 48.) The Spanos Defendants filed their supplemental letter on July 6, 2023, indicating that they joined in the Molokotos Defendants' supplemental brief. (See "Spanos Supp. Ltr.," Dkt. No. 49.)

On August 24, 2023, Plaintiff filed a second letter supplementing the record with evidence in support of her argument that she is domiciled in Washington, D.C. (See "Pl. Second Supp. Ltr.," Dkt. No. 52.) The Molokotos Defendants filed an opposition letter on August 28, 2023. (See "Molokotos Supp. Opp.," Dkt. No. 53.) Plaintiff filed a reply on August 29, 2023. (See "Pl. Supp. Reply," Dkt. No. 54.)

## II. <u>DISCUSSION</u>

Defendants move to dismiss Plaintiff's Amended Complaint for lack of subject matter jurisdiction, improper venue, and failure to state a claim upon which relief can be granted. As Defendants' Letter Motion to dismiss raises threshold issues on subject matter jurisdiction and venue, the Court must first address these grounds before resolving any other issues in the Letter Motion. See <u>PI, Inc. v. Quality Prod., Inc.</u>, 907 F. Supp. 752, 759-60 (S.D.N.Y. 1995) (noting that when

11

resolving a motion to dismiss for lack of jurisdiction, improper venue, and failure to state a claim, a court must first resolve jurisdiction and venue, in that order (citing Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963))). After considering the arguments, the Court finds that although it possesses subject matter jurisdiction to adjudicate the instant dispute, dismissal of the action is nonetheless appropriate for improper venue under Rule 12(b)(3). Thus, Defendants' Letter Motion is **GRANTED**, in part.

A.   LACK OF SUBJECT MATTER JURISDICTION[4]

Plaintiff commenced this action in federal court, alleging that this Court has diversity jurisdiction to hear this case pursuant to 28 U.S.C. Section 1332(a). (See Amended Complaint ¶¶ 23-25.) Defendants move to dismiss this entire action under Rule 12(b)(1) of the Federal Rules of Civil Procedure on the ground that Plaintiff is a U.S. citizen domiciled outside of the United States, thereby destroying diversity as courts may not exercise diversity jurisdiction over such parties. See Cresswell v. Sullivan & Cromwell, 922 F.2d 60, 68 (2d Cir. 1990).

---

[4] The Court held an evidentiary hearing on June 23, 2023 regarding subject matter jurisdiction at which two witnesses testified. (See "June 23, 2023 Hearing Transcript," or "Tr.," Dkt. No. 50.) The facts referenced in this section are thus derived from witness testimony and evidence entered into the record at the June 23, 2023 hearing. Except where relevant or specifically quoted, no further citation will be made to the hearing.

Rule 12(b)(1) requires that a claim be dismissed when a federal court lacks subject matter jurisdiction. <u>See</u> Fed. R. Civ. P. 12(b)(1). The two sources of subject matter jurisdiction for a federal district court are: (1) "federal question" jurisdiction, <u>see</u> 28 U.S.C. § 1331; and (2) "diversity" jurisdiction, <u>see</u> 28 U.S.C. § 1332(a).

Under 28 U.S.C. Section 1332, a federal court may exercise diversity jurisdiction in all civil actions where the amount in controversy exceeds $75,000 and "all adverse parties to [the] litigation [are] completely diverse in their citizenships." <u>Herrick Co., Inc. v. SCS Commc'ns, Inc.</u>, 251 F.3d 315, 322 (2d Cir. 2001). Diversity of citizenship exists between "citizens of different States" or between "citizens of a State" and "citizens or subjects of a foreign state." 28 U.S.C § 1332(a). However, United States citizens who are "domiciled abroad are neither citizens of any state of the United States nor citizens or subjects of a foreign state," and a court may not exercise jurisdiction over a matter involving such parties. <u>Herrick Co.</u>, 251 F.3d at 322 (quoting <u>Cresswell</u>, 922 F.2d at 68).

The burden of establishing diversity jurisdiction, which is assessed at the time the litigation is commenced, <u>see</u> <u>Linardos v. Fortuna</u>, 157 F.3d 945, 947 (2d Cir. 1998), lies with the party seeking a federal court to exercise

jurisdiction. <u>See</u> <u>Mehlenbacher v. Akzo Nobel Salt, Inc.</u>, 216 F.3d 291, 296 (2d Cir. 2000) (citing <u>McNutt v. General Motors Acceptance Corp.</u>, 298 U.S. 178, 189 (1936)). And in resolving a Rule 12(b)(1) motion, "a district court . . . may refer to evidence outside the pleadings." <u>Makarova v. United States</u>, 201 F.3d 110, 113 (2d Cir. 2000) (citing <u>Kamen v. American Tel. & Tel. Co.</u>, 791 F.2d 1006, 1011 (2d Cir. 1986)).

While Plaintiff asserts that she is domiciled in Washington, D.C., thereby satisfying the requirements for diversity of citizenship, Defendants contend that Lina's domicile is in Switzerland. Hence, as lawsuits brought by or against U.S. citizens domiciled abroad may not be premised on diversity, Defendants maintain that this action must be dismissed. <u>See</u> <u>Herrick Co.</u>, 251 F.3d at 322. Defendants do not dispute the amount in controversy, nor do they argue that the adverse parties would not be diverse if Lina were domiciled in Washington, D.C. Thus, the sole subject matter jurisdiction issue is whether Lina is domiciled in Washington, D.C. or abroad in Switzerland.

A party's domicile, for diversity purposes, is determined on "the date on which the complaint was filed." <u>Bogan v. Northwestern Mut. Life Ins. Co.</u>, 103 F. Supp. 2d 698, 700 (S.D.N.Y. 2000). Courts have endorsed a definition of domicile as "a person's 'home' or permanent base of

operations," and as "the place where a person dwells and which is the center of his [or her] domestic, social and civil life." National Artists Mgmt. Co., Inc. v. Weaving, 769 F. Supp. 1224, 1227 (S.D.N.Y. 1991) (quoting Restatement of Conflicts 2d §§ 11, 12 (1971)). Moreover, domicile has been understood as the place of one's "true fixed home and principal establishment, and to which, whenever [one] is absent[] . . . has the intention of returning." Linardos, 157 F.3d at 948 (internal quotation marks and citation omitted). There is thus both a physical and mental dimension to domicile, as it "is more than an individual's residence, although the two typically coincide." National Artists Mgmt. Co., 769 F. Supp. at 1227 (internal quotation marks omitted) (quoting 13B C. Wright & A. Miller, Federal Practice and Procedure § 3612 at 526–27 (1984)).

"Once domicile is established in one state, it is presumed to continue in existence, even if the party leaves that state, until the adoption of a new domicile is proven." Bevilaqua v. Bernstein, 642 F. Supp. 1072, 1073 (S.D.N.Y. 1986); see also Mitchell v. United States, 88 U.S. 350, 353 (1874) ("Mere absence from a fixed home, however long continued, cannot work the change. There must be the *animus* to change the prior domicile for another. Until the new one is acquired, the old one remains." (emphasis in original)).

The parties do not dispute that at the time Lina filed the complaint in this action, her physical residence was in Switzerland. However, as courts have remarked, physical residence alone is not sufficient to ascertain a party's domicile for the purposes of establishing diversity and thus subject matter jurisdiction. The Second Circuit employs a two-prong test to determine domicile: (1) "residence in a new domicile" and (2) "the intention to remain there." Linardos, 157 F.3d at 948 (quoting Sun Printing & Publishing Ass'n v. Edwards, 194 U.S. 377, 383 (1904)).

Generally, "when the place of actual residence is clear, it is typically unnecessary for the Court to inquire as to a party's intent to remain in the new state," Bogan, 103 F. Supp. 2d at 700, as a party's "residence at the time a lawsuit is commenced provides *prima facie* evidence of his domicile." Willis v. Westin Hotel Co., 651 F. Supp. 598, 601 (S.D.N.Y. 1986). However, courts have noted that a finding of both residence and intent "are alike necessary. Either without the other is insufficient." Linardos, 157 F.3d at 948 (quoting Sun Printing & Publishing Ass'n, 194 U.S. at 383).

When discerning a party's intent, a court must consider the "totality of the evidence," as no single factor is dispositive. National Artists Mgmt. Co., 769 F. Supp. at 1228. This includes "examin[ing] the entire course of a person's

16

conduct in order to draw the necessary inferences as to the relevant intent." Brignoli v. Balch, Hardy & Scheinman, Inc., 696 F. Supp. 37, 41 (S.D.N.Y. 1988). Courts will consider factors such as "the place where civil and political rights are exercised, taxes paid, real and personal property (such as furniture and automobiles) located, driver's and other licenses obtained, bank accounts maintained, location of club and church membership and places of business or employment." National Artists Mgmt. Co., 769 F. Supp. at 1228 (internal quotation marks and citation omitted). Other relevant factors include "whether the person owns or rents his place of residence, the nature of the residence (i.e., how permanent the living arrangement appears), affiliations with social organizations, and the location of a person's physician, lawyer, accountant, dentist, stockbroker, etc." Id. (citing Brignoli, 696 F. Supp. at 41 and Willis, 651 F. Supp. at 600).

In Bogan v. Northwestern Mutual Life Insurance Company, the plaintiff argued that he was domiciled in New York, and not in Connecticut, because he possessed documents showing insurance applications, voter registration, tax returns, and personal checks with his New York business address. See 103 F. Supp. 2d at 700. Though the district court acknowledged the documentary evidence supporting residence in New York, the court determined that the plaintiff's domicile was

17

Connecticut because he lived in Connecticut at the time the complaint was filed, he had lived in Connecticut for three years uninterrupted, he moved his belongings out of his New York residence, and he received daily correspondences in Connecticut. See id. at 700-01. The court also heavily credited the fact that the plaintiff voluntarily relinquished his home in Poughkeepsie, New York, his only New York property, and gave it to his ex-wife pursuant to a separation agreement. See id. at 701.

Like the plaintiff in Bogan, Lina here asserts that her domicile is Washington, D.C. because of her extensive ties to Washington, D.C. She and her husband, Carl, have previously rented and owned homes in Washington, D.C., while their son currently attends Georgetown University Law Center in D.C. She is registered to vote, pays taxes, and has bank accounts in Washington, D.C. However, courts have routinely held that voter registration, while it may carry some weight, is often not sufficient by itself to establish domicile. See Apace Communications, Ltd. v. Burke, No. 07 Civ. 6151, 2009 WL 1748711, at *4 (W.D.N.Y. Jun. 19, 2009) ("[S]uch an assessment must be made on a case-by-case basis, and on any given set of facts, a person's voting registration or behavior may not be especially probative of his domicile."). Courts have likewise determined that paying taxes and having bank accounts in a

particular state, while persuasive, is not always sufficient to establish domicile. See Bogan, 103 F. Supp. 2d at 700.

In Apace Communications, a district court in this Circuit found that a U.S. citizen defendant was domiciled in the United Kingdom (the "UK"), thereby establishing an absence of diversity, based on the defendant's long-term employment, his lease of a townhouse, the opening of a bank account, and his wife's presence in the UK. See 2009 WL 1748711, at *5. Plaintiff also sold his New York residence and did not take with him his automobile or other personal property located in New York. See id. The court rejected the plaintiff's argument that the defendant was domiciled in New York, even though he was registered to vote in New York, possessed a New York state driver's license, maintained a New York-based bank account, and lacked involvement in the UK in charitable, social, or religious organizations. See id. at *6. The court determined that by the time the complaint was filed, the defendant "had done virtually everything that would be expected of someone moving from New York to the UK" and that "[t]he few remaining connections between [the defendant] and New York State . . . were not in any way inconsistent with a change of domicile." Id. at *7.

At first glance, the facts in the instant matter appear analogous to those in Apace Communications and Bogan. The

documentary evidence Plaintiff presents is largely similar to the evidence introduced in both cases. However, the testimony and evidence presented at the evidentiary hearing in this action persuade the Court that unlike in Apace Communications and Bogan, Lina has not exhibited an intent to remain in Switzerland and become domiciled there. In other words, she has not in fact "done virtually everything that would be expected of someone moving" to Switzerland indefinitely. Apace Communications, 2009 WL 1748711, at *7.

Instead, the Court finds that both Lina and her husband, Carl, who was sequestered during Lina's examination at the hearing, credibly testified that they intended Washington, D.C. to be their home, the jurisdiction to which they would return. Though domicile is determined at the time that litigation is commenced, the Court finds that Lina's residential history provides crucial context for determining present intent. Lina testified that she and Carl lived in Washington, D.C. with their son until January 2001. They then moved to London because Carl, an attorney at a large international law firm, was transferred to the firm's London office. According to their testimony, neither Lina nor Carl intended to remain in London, and Carl had actively explored work opportunities in Washington, D.C., albeit to no avail given their family's financial needs. (See Tr. 14:3-7.)

20

Though they moved to Switzerland briefly for two years in 2006, they returned to London around 2008 because Carl obtained employment with a different U.S.-based law firm. While they wished to return to Washington, D.C., and Carl again actively searched for job opportunities there, as the United States was in the middle of a financial crisis in 2008, Carl was unable to find suitable employment in Washington, D.C. given his professional specialty in mergers and acquisitions. (See id. 15:15-21.)

As a result, Lina and Carl remained in London until the COVID-19 pandemic began. According to their testimony, Lina and Carl moved to Switzerland in 2020 because they felt they could no longer reside in London given certain health issues they both were experiencing. Both Lina and Carl testified that they are in high-risk categories for the COVID-19 virus as Lina suffers from a chronic lung condition (see id. 18:6-9), and Carl has a history for myocarditis (see id. 68:18-22). At the onset of the pandemic, they felt they had no choice but to relocate due to their health conditions. They chose Switzerland because of their difficulty traveling much farther, and favorable conditions that allowed for their immediate relocation to Switzerland, such as their ability to travel there quickly (see id. 68:24-69:2) and self-isolate in a rural farmhouse (see id. 69:14-15). Further bolstering the

21

argument that exceptional circumstances caused them to relocate and temporarily remain in Switzerland is that at the time of their relocation, Lina's father, Michael Molokotos, who was in Switzerland, was dying from advanced Alzheimer's, giving Lina and Carl greater reason to briefly prolong their stay. (See id. 70:17-19.)

The Court found persuasive Lina and Carl's testimony that their move to London and then to Switzerland was temporary -- that they always intended to and hoped to return to Washington, D.C. by the end of 2024 or early 2025.[5] (See id. 5:9-12.) They testified that they did not enjoy living in Switzerland, as they did not have close friends there and did

---

[5] On August 24, 2023, Plaintiff filed a letter supplementing the record with Plaintiff and Carl's signed lease for a home in Washington, D.C. which was scheduled to begin on September 6, 2023. (See Pl. Second Supp. Ltr., Ex. A.) Plaintiff also included a moving contract indicating that Plaintiff's property will be transported from Switzerland to Washington, D.C. (See id. Ex. B.) Defendants opposed the introduction of the additional evidence on the ground that "the relevant date in determining a party's domicile is the date on which the complaint was filed" and that "actions subsequent to that date . . . are inconsequential." (Molokotos Supp. Opp. at 1 (quoting Bogan, 103 F. Supp. 2d at 700).) Defendants also argue that intent is not part of the domicile inquiry where Plaintiff has only one residence. (See id. (citing National Artists Mgmt. Co., 769 F. Supp. at 1227).)

While the Court agrees that actions taken subsequent to the filing of the complaint should not be considered when assessing domicile, the Court need not consider whether the lease agreement and moving contract are consistent with Plaintiff's contention that she intended to return to Washington, D.C. because even without the additions to the record, the Court finds that Plaintiff has established that her domicile is Washington, D.C. Further, the Court finds Defendants' characterization of the domicile inquiry misleading. Plaintiff's residence is not in fact clear, as Defendants argue, as there is significant documentary evidence supporting domicile in either Switzerland or Washington, D.C. Thus, it is imperative that the Court inquire into intent in order to properly ascertain Plaintiff's domicile.

not like the insularity of the country. Instead, they preferred D.C., "a city of ideas" and "an international city" where they had extended family members and a large social and professional network of people, with whom they remained in contact. (Id. 9:24-10:20.) Carl also testified that he has been involved with the D.C. Bar Association, including working on the campaign of the president of the D.C. Bar, engaging in pro bono work, and mentoring. (See id. 78:14-79:6.)

While the Court recognizes that such "[d]eclarations of intent by the person whose domicile is in question are given heavy, but not conclusive, weight," the Court finds that Lina and Carl's conduct was consistent with their intent to return to Washington, D.C. Wiest v. Breslaw, No. 01 Civ. 5663, 2002 WL 413925, at *3 (S.D.N.Y. Mar. 15, 2002) (internal quotation marks omitted) (quoting Hamilton v. Accu-Tek, 13 F. Supp. 2d 366, 370 (E.D.N.Y. 1998)); see also Reich v. Lopez, No. 13 Civ. 5307, 2015 WL 1958878, at *2 (S.D.N.Y. Apr. 30, 2015), aff'd, 858 F.3d 55 (2d Cir. 2017) ("Self-serving statements of intent do not alone suffice to prove domicile. Rather, in this context, actions consistent with the intent to make a place one's home speak louder than words alone.").

The Court finds that Lina and Carl regularly took steps to prepare for their eventual return to Washington, D.C.,

evincing an intent to leave both London and Switzerland. According to their testimony, while living in London, Lina and Carl purchased a house in Washington, D.C. in July 2013, intending to use it as a family home upon their return. Though Defendants argue that the house was an "investment property" because the two never actually lived there (Tr. 33:11-14; 33:22-34:5), the Court credits their testimony that at the time of the purchase, the house was intended to be used as their home upon their return. (See id. 33:17-24.) While the Court acknowledges that they eventually sold the house in December 2020, the sale of the house occurred within the first year of the COVID-19 pandemic and is consistent with the fact that Lina and Carl encountered financial constraints that made maintaining and keeping the property too costly. (See id. 63:1-8.)

Further, the Court notes that as of the date that this action was filed, Carl was listed as both guarantor and tenant of a Washington, D.C. apartment in which his son resides while attending Georgetown Law. (See id. 63:13-64:3.) Though Carl did not physically reside in the D.C. apartment, the Court recognizes that he was indeed renting property in Washington, D.C. during the relevant time period.

The Court also found persuasive Carl's testimony that had the pandemic not occurred, both he and Lina planned to

move to Washington, D.C. upon leaving London. Carl testified
that he took steps while still in London to begin his and
Lina's transition back to Washington, D.C., including
transferring his IRA and financial accounts to advisors in
Washington, D.C. and Virginia in 2019 to prepare to buy a
home, and listing their London flat for sale in 2021. (See
id. 71:14-23.) While in Switzerland, the couple had purchased
and lived in a chalet that they named Carlina, that was
located in the mountains and was intended to serve as a
holiday home. However, in or around September 2022, roughly
six months before Plaintiff initiated this action, they
prepared rental brochures and rental contracts in order to
rent out the chalet property, as they did not intend to live
there year-round. (See id. 35:14-36:11.) They also created
accounts on Trulia and Zillow to search for real estate in
Washington, D.C. (See id. 23:9-16; 91:6-12.)

Moreover, while not dispositive, the codicil and
holographic wills of Lina and Carl, executed in London and
Switzerland, respectively, further substantiate Plaintiff's
contention that she was "temporarily residing" in these
foreign countries, and that her permanent residence was in
the United States. (See id. 24:13-17; 25:21-25; Exs. PX-01 at
LML615-29, PX-02 at LML630-34.) Defendants argue that Carl
testified that the wills indicated that Carl and Lina were

25

domiciled in Washington, D.C. only because they wished to apply D.C. law to the wills. Though this desire for applying D.C. law may have constituted the couple's primary intent for the way their wills were drafted, the Court is not persuaded that this circumstance undermines or contradicts Plaintiff's contention that her domicile is Washington, D.C., not Switzerland or London.[6]

Defendants also argue that in addition to Lina's physical presence in Switzerland, she was domiciled in Switzerland based on several documents. First, Defendants argue that in a Tax Reminder to the Cantonal Tax Administration in Geneva, Switzerland, Lina represented to the Swiss government that she was "domiciled in the canton of Vaud," Switzerland. (See Def. Ex. 32; Dkt. No. 35-1, Ex. A.) Likewise, a second document, a certificate of inheritance naming Lina as an heir to her late father's estate, states that she is "domiciled" in Switzerland. (See id., Ex. B.) Third, Defendants argue that though Lina and Carl both obtained B Permits, which are visas that allow them to live in Switzerland temporarily, the B Permits similarly indicate

---

[6] Defendants, in their supplemental letter to the Court, add the argument that if Plaintiff is not domiciled in Switzerland, she is domiciled in the UK, where she became a citizen in 2015. (See Molokotos Supp. Ltr. at 2.) However, the Court is not persuaded that the elements for establishing domicile in the UK, including residence and intent, have been satisfied.

that they are "domiciled" in Switzerland. (See Tr. 83:24-84:4.)

At the hearing, Lina testified that references to Swiss domicile in the documents meant "tax domicile" for "tax purposes" and not any "intention to be . . . permanently domiciled in Switzerland." (Id. 54:8-18.) Carl similarly testified that the "domicile" on the B Permit was "[f]or tax purposes." (Id. 84:5-16.) He also testified that the B Permit is "the lowest level of permit[]" in Switzerland, which is conditioned upon the permit holder being fully employed or having sufficient finances. (Id. 70:20-71:3.) According to his testimony, Carl acquired the B Permit only because he was unable to travel during the COVID-19 pandemic and needed authorization to legally work and be fully tax compliant with Swiss laws. (See id. 71:4-8.) Though the B Permit allows Carl to work, it does not allow Lina to work in Switzerland. (See Amended Complaint ¶ 43.)

Defendants counter that contrary to Plaintiff's assertion, the definition of "domicile" under Swiss law is consistent with the definition of "domicile" under U.S. law (see Def. Supp. Ltr. at 2 n.6), indicating that Plaintiff was in fact domiciled in Switzerland for diversity purposes. The Court, however, finds that Defendants' extensive inquiry into the Swiss law's definition of "domicile" is not constructive,

27

as the use of the term "domicile" in Swiss legal documents does not necessarily speak to Plaintiff's *intent to remain* in Switzerland and make it her home. Just as documents alone are not dispositive in establishing Plaintiff's domicile in Washington, D.C., neither are these Swiss documents dispositive in establishing Swiss domicile. This is true especially in light of Lina's *lack* of intent to remain in Switzerland and the proactive steps taken by her and Carl to effectuate their return to Washington, D.C. -- including, among other things, working with a rental agency to rent out her Swiss chalet[7] while actively searching for homes for sale in Washington, D.C.

During cross examination, Lina testified that she and Carl obtained Swiss driver's licenses, and Carl testified to creating a company under Swiss law. However, while these factors lend some support to Defendants' argument that Plaintiff is domiciled in Switzerland, the Court is not persuaded that these factors are dispositive in light of the emergency circumstances that led Lina and Carl to

---

[7] Though Defendants argue that Lina and Carl engaged in extensive renovations of their Swiss chalet, suggesting an intent to remain in Switzerland (see Def. Supp. Ltr. at 2), the Court finds that such activities are consistent with Lina's stated purpose of eventually renting out the chalet to third-party tenants when Plaintiff and her family are not living there.

Switzerland, and the more compelling actions they have since taken to effectuate their return to Washington, D.C.

The Court also finds unpersuasive Defendants' attempt to undermine Lina's credibility by claiming she likely perjured herself by writing her old address, specifically her address on Macomb Street in Washington, D.C., which is where she had resided roughly 23 years ago, on a voter registration and absentee ballot request on April 27, 2023. (See Tr. 46:25-49:25.) The Court finds it unlikely that Lina *knowingly* made a false statement with the intent to deceive. The Court finds it more likely that, as Lina testified, she made a mistake based on misreading the question as to what her last address in Washington, D.C. was. (See id. 46:25-47:17.)

The Court found credible the explanation that Lina and Carl, despite a sincere intent to return to Washington, D.C., were caught in a situation that required them to remain in Switzerland for the time being. The Court has considered Defendants' arguments that Plaintiff has not physically resided in the United States since January 2001, that there are several documents indicating "domicile" in Switzerland, that she and Carl purchased, renovated, and furnished a chalet, and that they obtained Swiss licenses, paid taxes, and formed a company there. The Court has also considered however, the substantial documentary evidence supporting

29

Lina's domicile in Washington, D.C., as discussed above. Thus, where the physical evidence may almost equally suggest a finding of either Swiss or Washington, D.C. domicile, an inquiry into Lina's intent and conduct consistent with that intent tips the scale ever so slightly in favor of a finding that Lina's domicile is in fact in Washington, D.C.

Additionally, considering the tumultuous years of the COVID-19 pandemic, the Court is mindful of how the pandemic upended lives and long-held plans for millions of people all over the world. The Court cannot fail to take into account that the health risks associated with the virus, financial burdens imposed by the resulting economic downturn, and general disarray that the pandemic left in its wake have certainly played a significant role in delaying or preventing the return home of many American citizens residing abroad and causing them to execute contingency plans to adapt to the impacts of the pandemic. Particularly, Lina and Carl's abrupt move from London to Switzerland at the height of the COVID-19 pandemic, in large part due to Lina and Carl's legitimate health concerns, suggests that their move was out of convenience and not due to an intent to make Switzerland their intended domicile. The actions taken by Lina and Carl in the months leading up to the filing of the complaint in this case strongly support a reasonable finding that Lina and Carl

intend to return "home" to Washington, D.C. as their domicile, and do not intend to remain abroad indefinitely. Accordingly, based on the record and testimony, the Court finds that Plaintiff's domicile is Washington, D.C. As the Court may exercise diversity jurisdiction over this action, Defendants' Letter Motion to dismiss under Rule 12(b)(1) is **DENIED**.[8]

B.   IMPROPER VENUE

The Court now turns to Defendants' argument that this Court is an improper venue or forum to hear the action under Rule 12(b)(3) of the Federal Rules of Civil Procedure.[9] Rule 12(b)(3) provides that a court may dismiss a claim for improper venue. See Fed. R. Civ. P. 12(b)(3). The plaintiff bears the burden of proof of establishing proper venue in order to survive a Rule 12(b)(3) motion. See United States ex rel. Donohue v. Carranza, 585 F. Supp. 3d 383, 387 (S.D.N.Y. 2022). And "[a]s with a motion to dismiss for lack of subject matter jurisdiction, courts may consider materials outside the pleadings on a motion to dismiss for improper venue." Caremark Therapeutic Servs. v. Leavitt, 405 F. Supp. 2d 454,

---

[8] Defendants also request in their supplemental brief that the Court issue sanctions against Plaintiff for improper expenditure of time and resources in arguing domicile. (See Molokotos Supp. Ltr. at 3.) However, the Court denies Defendants' request for sanctions at this time as they were unsuccessful on this ground.

[9] The Court notes that the improper venue argument was raised by the Spanos Defendants, specifically, but will refer to them as "Defendants" for the sake of brevity.

457 (S.D.N.Y. 2005); TradeComet.com LLC v. Google, Inc., 693
F. Supp. 2d 370, 375 n.3 (S.D.N.Y. 2010).

Defendants argue that venue is improper because the
forum selection clause in the 2015 Molokotos Family Trust
Agreement[10] (see "Trust Agreement" or the "Agreement," Dkt.
No. 35-2, Ex. B) restricts venue to state courts in New York,
and Plaintiff brought this action in federal district court
in the Southern District of New York ("SDNY"). Plaintiff
counters that the forum selection clause does not govern the
instant action, as several claims fall beyond the scope of
the clause. Based on the forum selection clause, the Court
finds that venue is improper in this action, and grants
Defendants' Letter Motion to dismiss on this ground.

There is a split of authority in this Circuit on whether
a forum selection clause should be enforced under the improper
venue ground or another ground, such as *forum non conveniens*,
lack of subject matter jurisdiction, or failure to state a
claim. See generally New Moon Shipping Co., Ltd. v. MAN B &
W Diesel AG, 121 F.3d 24, 28-29 (2d Cir. 1997) ("[T]here is
no existing mechanism with which forum selection enforcement
is a perfect fit."). However, because Defendants framed the

---

[10] Although Defendants also reference the 2001 Molokotos Family Trust
Agreement, the Court refers to and cites only to the 2015 Trust Agreement
as the forum selection clauses in both agreements are identical.

challenge to the forum to litigate this action as a Rule
12(b)(3) motion for improper venue, and Plaintiff does not
object to the particular ground under which Defendants move,
the Court will treat this motion as a Rule 12(b)(3) motion to
dismiss based on improper venue. See, e.g., Person v. Google,
Inc., 456 F. Supp. 2d 488, 492 (S.D.N.Y. 2006) (noting that
a motion to dismiss based on a forum selection clause "will
be considered under Fed. Civ. P. Rule 12(b)(3) because that
is how it was framed by the parties").

Here, the forum selection clause in the 2015 Trust
Agreement states, in relevant part, that "[t]he Trustees
hereby submit to the exclusive jurisdiction of the courts of
the state of New York with respect to the supervision of the
administration of all trusts created hereunder[.]" (Trust
Agreement § 13(i).)

As an initial matter, the Court must address whether the
forum selection clause at issue provides for venue in both
state and federal courts in the state of New York, as
Plaintiff contends, or exclusively in state courts in New
York, as Defendants contend.

There is a general consensus among courts in this
District that clauses providing "courts of the State of New
York" as the proper forum typically set venue in New York
*state*, not federal, courts. See Wagley v. JP Morgan Chase

Bank, N.A., No. 18 Civ. 8668, 2019 WL 13223235, at *6
(S.D.N.Y. 2019) (noting agreement between the parties that
the phrase "'the courts of that state' refers to New York
state courts, and not to federal courts located in New York");
Union Capital LLC v. Vape Holdings Inc., No. 16 Civ. 1343,
2016 WL 8813991, at *2 (S.D.N.Y. Mar. 9, 2016) (noting that
"some courts have construed similar language to include New
York state courts, but not federal courts located within the
State of New York"); Phoenix Glob. Ventures, Inc. v. Phoenix
Hotel Assocs., Ltd., No. 04 Civ. 4991, 2004 WL 2360033, at *6
(S.D.N.Y. Oct. 19, 2004) ("The language, '[a]ny proceeding
shall be initiated in the courts of the State of New York,'
clearly establishes exclusive jurisdiction in New York state
courts."); see also Sahara Sam's Oasis, LLC v. Adams Cos.,
Inc., No. 10-0881, 2010 WL 3199886, at *6 (D.N.J. Aug. 12,
2010) ("As a matter of contract interpretation, when a
contract term refers to the courts 'of' a certain state or
county, it is a marker of sovereignty rather than geography,
and therefore only state courts are implicated.").

Plaintiff argued at the June 9, 2023 conference that
because the "s" in "state of New York" is not capitalized,
venue is not limited to state courts, but is rather inclusive
of federal courts. Plaintiff did not cite any case in which
a court has remarked that a lowercase "s" in "state"

34

specifically broadens the authorized courts to all courts, including federal, in that state.

Instead, where courts have found that venue is also proper in federal district courts, the forum selection clause specifically indicated that federal courts, or the Southern District of New York, for example, would have jurisdiction to hear such suits. See, e.g., Neuman v. Garcia, No. 20 Civ. 10723, 2022 WL 4448722, at *3 (S.D.N.Y. Sept. 23, 2022) (examining settlement agreement that stated that agreement shall be brought "in the state of [sic] federal courts of the state of New York"); Encompass Aviation, LLC v. Surf Air Inc., No. 18 Civ. 5530, 2018 WL 6713138, at *8 (S.D.N.Y. Nov. 30, 2018) (examining forum selection clause that provided that litigation may be instituted "in the federal courts of the United States of America or the courts of the state of New York"); ErGo Media Cap., LLC v. Bluemner, No. 15 Civ. 1377, 2015 WL 6442252, at *2 (S.D.N.Y. Oct. 23, 2015) (analyzing forum selection clause that provided that litigation related to agreement would be brought in New York state court in Manhattan or federal court "in the Southern District of New York").

Moreover, where forum selection clauses providing venue in the "courts of the State of New York" have been read as including federal courts, courts have specifically read

several related documents, each containing the relevant forum selection clause, together. For example, in Union Capital LLC v. Vape Holdings Inc., a district court in New York examined a forum selection clause under a convertible redeemable note agreement that provided that jurisdiction and venue shall be "in the courts of the State of New York." 2016 WL 8813991, at *2. In finding that such venue included federal courts, the court looked at a corresponding securities purchase agreement ("SPA"), which expressly included federal courts in its forum selection clause. See id. at *2-3. The district court found it proper to read and interpret the documents together because "they were executed the same day, involved the same parties, and served the same purpose." Id. at *3. The court also noted it would be otherwise superfluous for the SPA to include SDNY as a proper forum if only state courts were to have exclusive jurisdiction. See id. Thus, it found that venue was proper in both state and federal courts. See id.

Likewise, in Adar Bays, LLC v. Aim Exploration, Inc., the defendant moved to dismiss an action filed in this Court on the ground that the forum selection clause contained in a note upon which plaintiff's complaint was premised provided "exclusive jurisdiction and venue in the courts of the State of New York." 251 F. Supp. 3d 704, 706 (S.D.N.Y. 2017) (Marrero, J.) (internal quotation marks omitted) (quoting the

forum selection clause in the contract at issue). However, this Court determined that the forum selection clause in the note could not be read in isolation, as it was part of an integrated writing that, like the agreement in Union Capital, included an SPA. See id. at 708-09. The SPA expressly provided that venue was proper "in the state courts of New York *or* in the federal courts located in the state and county of New York." Id. at 708 (internal quotation marks omitted) (quoting SPA agreement at issue). The Court ultimately determined that it was proper to read the note and the SPA together, as the note was not entered into in isolation. Indeed, "[t]he SPA and the Note 'were executed the same day, involved the same parties, and served the same purpose, namely to effectuate [Defendant's] sale of a convertible note to Plaintiff.'" Id. at 709 (alterations in original) (quoting Union Capital, 2016 WL 8813991, at *3). Thus, in reading and interpreting the several documents together, the Court determined that the venue clause in the note covered both federal and state courts in the state of New York.

Here, unlike in Union Capital and Adar Bays, there is no other corresponding or related document that asserts another venue or broadens the existing venue clause. The sole relevant document, the Trust Agreement, provides that only "the courts of the state of New York" have exclusive jurisdiction over

matters of trust administration. (Trust Agreement § 13(i).) Thus, it is proper to read the forum selection clause as providing only state courts in the state of New York with exclusive jurisdiction over matters relating to the 2015 Trust.

Having established that this Court is not a forum authorized under the forum selection clause of the Trust Agreement to adjudicate the parties' dispute in this action, the Court now turns to whether the forum selection clause at issue should be enforced. The Second Circuit in Phillips v. Audio Active Ltd., 494 F.3d 378, 383 (2d Cir. 2007), articulated a four-part test for determining whether to enforce a forum selection clause on a Rule 12(b)(3) motion. According to the Phillips court,

> [t]he first inquiry is whether the clause was reasonably communicated to the party resisting enforcement. The second step requires us to classify the clause as mandatory or permissive, i.e., to decide whether the parties are required to bring any dispute to the designated forum or simply permitted to do so. Part three asks whether the claims and parties involved in the suit are subject to the forum selection clause.

Id. at 383 (internal citations and quotation marks omitted). If the first three prongs are satisfied, the forum selection clause is "presumptively enforceable." Id. The final step, then, "is to ascertain whether the resisting party has rebutted the presumption of enforceability by making a

38

sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" Id. at 384 (quoting M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972)). The Court will address each of the prongs in turn.

    1. Whether the Clause was Reasonably Communicated to the Parties

The first step of the Phillips inquiry requires courts to determine whether a forum selection was reasonably communicated to the resisting party. See id. at 383. Generally, "[a] forum selection clause is reasonably communicated [to a party] if it is stated in clear and unambiguous terms." In re Refco Inc., Sec. Litig., No. 07 MDL 1902, 2009 WL 10666099, at *6 (S.D.N.Y. Nov. 20, 2009), report and recommendation adopted sub nom. In re Refco, Sec. Litig., No. 07 MDL 1902, 2010 WL 11500547 (S.D.N.Y. Jan. 21, 2010) (citing Effron v. Sun Line Cruises, Inc., 67 F.3d 7, 9 (2d Cir. 1995)). Plaintiff argues that the forum selection clause in the Trust Agreement was not reasonably communicated to her, the party against whom enforcement is sought, because she was not even aware that she was a beneficiary of the Trust until learning of the Defendants' alleged misconduct in 2022, and thus the venue provision was never communicated to her. (See Pl. Supp. Ltr. at 3.)

The Court notes that the actual signatories of the Trust Agreement were Michael and Helen Molokotos, the Grantors of the Trust, and James Spanos as Trustee. Conceivably, Lina did not know about the forum selection provision contained in the Agreement, first and foremost because as a beneficiary, she was not a party to the Agreement. The Court recognizes that it is unlikely that a beneficiary necessarily would be properly apprised of a contract and its provisions prior to the contract being executed. Then, practically speaking, it is not in dispute that the forum selection clause was not "reasonably communicated" to Lina in the sense that she was not aware of the clause prior to the Trust Agreement's execution. However, that Lina was not aware of the clause prior to the execution of the Trust Agreement does not automatically invalidate the forum selection clause.

In analogous circumstances such as in the context of welfare benefit plans, courts have declined to invalidate forum selection clauses even where a beneficiary did not have prior notice or knowledge of the clause. Indeed, as a district court in California observed, "a strict requirement of advance notice [of an applicable venue provision to plan beneficiaries] 'would invalidate every forum selection clause in an employee welfare benefit plan.'" Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc., No. CV-14-02139,

2015 WL 12733443, at *14 (C.D. Cal. Apr. 10, 2015) (quoting
Laasko v. Xerox Corp., 566 F. Supp. 2d 1018, 1024 (C.D. Cal.
2008)). Such courts have considered that as these plans are
"negotiated between a plan administrator and an employer, the
forum-selection clause obviously does not reflect any
preference of the beneficiaries." Laasko, 566 F. Supp. 2d at
1024 (internal quotation marks omitted) (quoting Schoemann ex
rel. Schoemann v. Excellus Health Plan, Inc., 447 F. Supp. 2d
1000, 1007 (D. Minn. 2006)).

In Schoemann ex rel. Schoemann, a district court in
Minnesota observed that in the context of an employer-
sponsored welfare-benefit plan governed by the Employee
Retirement Income Security Act ("ERISA"), "it is likely that
a typical beneficiary does not even know that the forum
selection clause exists." 447 F. Supp. 2d at 1007. The
Schoemann court remarked that courts will enforce these forum
selection clauses because the actual parties to the contract
involved in the negotiations had "notice of the clause and
the ability to reject the contract." Id.

The Court finds Plaintiff's situation here comparable to
the circumstances facing beneficiaries in the ERISA context.
Indeed, it is not unusual that a beneficiary to an irrevocable
trust, whose assets would be distributed upon the death of

41

the grantor (see Trust Agreement § 1(b)), was not aware of or apprised of the forum selection clause.

While "[i]n general, awareness by a nonsignatory of a forum selection clause or of the contract in which such a clause is contained is enough to satisfy the first [Phillips] condition," lack of awareness under the first prong is not necessarily fatal to enforcing the clause. Overseas Ventures, LLC v. ROW Mgmt., Ltd., Inc., No. 12 Civ. 1033, 2012 WL 5363782, at *4 (S.D.N.Y. Oct. 26, 2012).

In fact, "[e]ven in the absence of actual awareness, a non-signatory can be bound [by a forum selection clause] if it is 'closely related' to the signatory to the contract containing the clause." Id. More specifically, a non-party will still "be bound by a valid forum selection clause if the party is 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound." In re Refco Inc., 2009 WL 10666099, at *9 (internal quotation marks omitted) (quoting Hugel v. Corp. of Lloyd's, 999 F.2d 206, 209 (7th Cir. 1993)). "The rationale for binding non-signatories is based on the notion that forum selection clauses 'promote stable and dependable trade relations,' and thus, that it would be contrary to public policy to allow non-signatory entities through which a party acts to evade the forum selection clause." Highland Crusader Offshore Partners, L.P.

42

v. Targeted Delivery Techs. Holdings, Ltd., 124 N.Y.S.3d 346,
352 (App. Div. 1st Dep't 2020) (quoting Tate & Lyle
Ingredients Americas, Inc. v. Whitefox Techs. USA, Inc., 949
N.Y.S.2d 375, 377 (App. Div. 1st Dep't 2012)). Courts in this
Circuit have regularly adopted and applied this "closely
related" standard to determine whether non-signatories are
bound by a contract and the provisions contained therein, and
the Court does so here. See In re Refco Inc., 2009 WL 10666099,
at *9 (collecting cases).

        In the instant matter, there is no dispute that Lina is
"closely related" to this dispute. She is a named beneficiary
of the Trust and of the Trust Agreement that she seeks to
enforce through this action. It is no surprise and indeed
foreseeable that a beneficiary would be bound by an agreement
that sets out the terms and conditions of a trust from which
she benefits. Failure to enforce a forum selection clause in
such a trust agreement would frustrate the intent and
expectation of the grantor in this regard, and effectively
empower a beneficiary to not only undo what the grantor
contemplated, but also potentially impede the interests of
other beneficiaries.

        In addition to Lina being closely related to the
underlying dispute, "[i]t is well-settled that a party
seeking to obtain the benefits of a contract must also accept

its burdens, including contractual forum selection." Id. (citing Ana Distribution Inc. v. CMA-CGM (America) Inc., 329 F. Supp. 2d 565, 567 (S.D.N.Y. 2004)); see also Shugrue v. Ins. Co. of State of Pennsylvania, 180 B.R. 53, 56 (S.D.N.Y. 1995) ("[W]ell-settled principles of estoppel dictate that where a party seeks the benefits of a contract, it cannot disaffirm its burdens."); see also Schoemann ex rel. Schoemann, 447 F. Supp. 2d at 1007 (noting that the ERISA plan "defines the rights and obligations of the plan administrator and the beneficiaries," and by bringing suit, the plaintiff beneficiaries claiming rights under the plan "must take the bad with the good"); Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., No. A-07-CA-421, 2007 WL 3256210, at *6 (W.D. Tex. Nov. 2, 2007) ("[U]nder 'the direct-benefit estoppel theory,' nonsignatories can be bound by a forum selection clause when they knowingly exploit the agreement containing the clause.").

Here, the Court is persuaded that despite the forum selection clause not being communicated to Lina prior to the execution of the Trust Agreement, her seeking to otherwise enforce the terms of and obtain the benefits provided by the Agreement estops her from challenging the forum selection clause contained therein. Lina is not claiming that the forum selection clause itself was procured by fraud in any way,

such that there would be grounds for invalidating it. Rather, by seeking to enforce the Agreement, she is implying that that in all other material respects, the Agreement itself is valid. Thus, she may not then also disclaim other valid provisions of the Agreement. For these reasons, the Court finds that the first prong of the Phillips inquiry is satisfied in this case.

2. Mandatory or Permissive

Second, the Court must determine whether the forum selection clause in the Trust Agreement is mandatory or permissive, i.e., "whether the parties are required to bring any dispute to the designated forum or simply permitted to do so." Phillips, 494 F.3d at 383. Generally, "a clause is considered mandatory if it either confers exclusive jurisdiction on a particular forum or uses obligatory venue language." LVAR, L.P. v. Bermuda Com. Bank Ltd., No. 13 Civ. 9148, 2015 WL 1267368, at *3 (S.D.N.Y. Mar. 18, 2015), aff'd, 649 F. App'x 25 (2d Cir. 2016) (citing Phillips, 494 F.3d at 386).

Here, the forum selection clause explicitly provides that "[t]he Trustees hereby *submit to the exclusive jurisdiction* of the courts of the state of New York . . . ." (Trust Agreement § 13(i).) The language "submit to the exclusive jurisdiction" is "precisely the type of language

45

that courts have routinely relied upon to find forum selection clauses to be mandatory." Prod. Res. Grp., L.L.C. v. Martin Pro., A/S, 907 F. Supp. 2d 401, 410-11 (S.D.N.Y. 2012) (citing Magi XXI, Inc. v. Stato Della Citta Del Vaticano, 818 F. Supp. 2d 597, 605 (E.D.N.Y. 2011)); see, e.g., id. (finding that a forum selection clause that provides that "the Parties hereby submit to the *exclusive jurisdiction* of the Courts of England and Wales" was mandatory); KTV Media Int'l, Inc. v. Galaxy Group, LA LLC, 812 F. Supp. 2d 377, 384-85 (S.D.N.Y. 2011) (determining that a forum selection clause that provided that the parties consent to the "exclusive jurisdiction" of California courts was mandatory); see also LVAR, 2015 WL 1267368, at *3 (finding mandatory a forum selection clause that provided "the courts of Bermuda *shall be the forum* for the administration" of the trust at issue, as it constituted "clear obligatory language"). Thus, the Court finds that the language in the Trust Agreement here is clearly mandatory, and not permissive.

3. Scope of the Forum Selection Clause

The third prong of the Phillips analysis requires courts to determine "whether the claims and parties involved in the suit are subject to the forum selection clause." Phillips, 494 F.3d at 383 (citing Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1358-61 (2d Cir. 1993)). A court determining the scope

of such a clause must "'examine the substance of th[e] claims, shorn of their labels,' and relate[] the substance of the claims 'to the precise language of the clause,' 'discount[ing] the precedential weight of cases that deal with dissimilarly worded clauses.'" <u>Prod. Res. Grp., L.L.C.</u>, 907 F. Supp. 2d at 412 (quoting <u>Phillips</u>, 494 F.3d at 388-90).

Plaintiff argues in her pre-motion opposition letter, and repeated at the case management conference, that the forum selection clause in the Trust Agreement does not apply to her claims. She contends that the clause is limited to matters of "trust administration" and that several of the tort causes of action she asserts lie beyond the scope of trust administration, thereby rendering the forum selection clause inapplicable.

Relying on <u>LVAR</u>, Defendants contend, in rebuttal, that Plaintiff's tort claims related to the Trust are within the scope of "administration of all trusts" as provided in the forum selection clause of the Trust Agreement. <u>See</u> 2015 WL 1267368, at *3-4. In <u>LVAR</u>, the district court determined that a forum selection clause, which stated that "courts of Bermuda shall be the forum for the administration" of the trust, encompassed a beneficiary's claims for breach of contract, breach of fiduciary duty, fraud, and negligence resulting from the mismanagement of the trust. <u>Id.</u> at *3. Relying on

47

definitions provided by other courts and the Third Restatement of Trusts, the <u>LVAR</u> court found that the plaintiff's claims were "plainly related to the 'administration' of the LVAR Trust and [were] covered by the clause" because it had alleged that the defendants' purported fraud involved misinformation about trust assets and investments supplied by the defendants. <u>Id.</u> (citing <u>In re Lloyd's Am. Trust Fund Litig.</u>, 954 F. Supp. 656, 681 (S.D.N.Y. 1997) and Restatement (Third) of Trusts § 76 (2007)). The plaintiff's claims were found to be integrally related to the LVAR trust's administration and therefore within the scope of the forum selection clause. <u>See</u> <u>id.</u>

Here, Plaintiff argues that <u>LVAR</u> involved a different factual predicate and is therefore inapplicable. However, Plaintiff's allegations of constructive fraud and negligent misrepresentation are fundamentally related to the administration and management of the Trust. More concretely, Plaintiff alleges that the Trustees mismanaged Trust assets, were grossly negligent in preventing the misuse and depletion of Trust funds, and failed to share basic information about the accounts and assets of the Trust. The Court finds that these allegations fall squarely within the scope of "administration" of the Trust. (<u>See</u> Amended Complaint ¶¶ 252-253.)

Likewise, in <u>In re Lloyd's American Trust Fund Litigation</u>, cited by the <u>LVAR</u> court, a court in this District noted that "[a]dministration of a trust normally rests with the trustee . . . [and t]he trustee may not passively permit another party to harm the trust." 954 F. Supp. at 681 (citing <u>In re Pate's Estate</u>, 84 N.Y.S.2d 853, 862 (Sur. Ct. N.Y. Cnty. 1948), <u>aff'd</u>, 95 N.Y.S.2d 903 (App. Div. 1st Dep't 1950)). That the Trustees here allegedly permitted the other Defendants in this action to commit fraud as it pertains to the Trust, is undoubtedly intertwined with the Trustees' administration and purported mismanagement of the Trust.[11] Thus, the Court finds that Plaintiff's claims fall within the scope of the forum selection clause providing that state courts in the state of New York will govern this action exclusively.[12]

---

[11] Moreover, the Court is not persuaded by Plaintiff's argument that because some of her causes of action are tort claims, they are automatically beyond the reach of the forum selection clause. <u>See</u> <u>ErGo Media Cap., LLC</u>, 2015 WL 6442252, at *2 ("[C]laims sounding in tort rather than in contract do not automatically place them beyond the scope of the forum selection clause."); <u>Elec. Mobile Cars, LLC v. Elec. Mobile Cars, Inc.</u>, No. 12 Civ. 5202, 2012 WL 5264454, at *2 (S.D.N.Y. Oct. 17, 2012) ("A contractually-based forum selection clause will also encompass tort claims if the tort claims . . . involve the same operative facts as a parallel claim for breach of contract." (internal quotation marks and citation omitted)).

[12] Plaintiff also argues that the forum selection clause's designation of all trusts as "U.S. persons for Federal income tax purposes" protects federal rights and issues, and therefore renders a federal forum the only correct forum to enforce these rights. (<u>See</u> Pl. Supp. Ltr. at 3.) However, Plaintiff cites no case to support this assertion, and the Court finds this argument unavailing.

The Court is also persuaded that the parties to this action are subject to the forum selection clause. James Spanos, as Trustee of the Molokotos Trust and a signatory to the Trust Agreement, is undoubtedly related to and directly covered by the forum selection clause of the Trust Agreement, as is Helen Molokotos, one of the Grantors of the Trust. (See Trust Agreement at 1.) Thus, while by reason of the forum selection clause this Court is not a proper forum to resolve the claims Lina asserts against James Spanos and Helen Molokotos, the Court must determine whether Penny Spanos, Thanasis Molokotos, and Diane Molokotos, who are not signatories to the Trust Agreement, are likewise subject to the forum selection clause.

As explained above, courts apply the "closely related" doctrine to determine whether a non-signatory is bound by a forum selection clause. See Metro-Goldwyn-Mayer Studios Inc. v. Canal & Distrib. S.A.S., No. 07 Civ. 2918, 2010 WL 537583, at *5 (S.D.N.Y. Feb. 9, 2010) ("[A] signatory to a contract may invoke a forum selection clause against a non-signatory if the non-signatory is closely related to one of the signatories." (internal quotation marks and citations omitted)). In determining whether the forum selection clause applies, "the non-signatory must have been otherwise involved in the transaction in some manner." Recurrent Capital Bridge

Fund I, LLC v. ISR Sys. and Sensors Corp., 875 F. Supp. 2d
297, 307-08 (S.D.N.Y. 2012).

With respect to Penny Spanos, she was a named Trustee to
the 2001 Trust, but not to either of the 2015 or 2016 Trusts.
(See Amended Complaint ¶¶ 95-98.) According to Plaintiff,
though Penny Spanos was relieved of her duty as Trustee, she
nonetheless was "the de facto Trustee of the Trusts" in that
she actively participated in managing and administering the
2015 Trust and handled correspondences involving James Spanos
in his role as Trustee. (Id. ¶¶ 174-75.) Penny Spanos's
alleged conduct leaves little doubt that she "was involved in
the transaction" and in the administration of the Trust in a
significant way. Recurrent Capital Bridge Fund I, 875 F. Supp.
2d at 308. Thus, Penny Spanos is sufficiently related to James
Spanos, and her alleged conduct is also closely connected
with administering the Trust, such that it is foreseeable
that she would be bound by the forum selection clause.

Similarly, the remaining Defendants, Thanasis and Diane
Molokotos, are closely related to the signatories such that
enforcement of the forum selection clause against them is
reasonable and foreseeable. Like Lina, Thanasis is a named
beneficiary of the Trust. (See Amended Complaint ¶ 57.) Diane,
as Helen's daughter-in-law and Thanasis's wife, managed
companies in the British Virgin Islands, where the Trust

51

assets were held. (See id. ¶ 6.) In fact, Diane is the sole director and shareholder of these companies, and is allegedly primarily responsible for the "intentional and bad faith removal" of the Trust assets. (Id. ¶ 14.) Lina asserts that Thanasis, Diane, and Helen worked in concert to deplete the assets held in the 2015 Trust, and demonstrated bad faith conduct, violating the terms of the Trusts. (See id. ¶ 136.) Moreover, according to Lina, "each of the Molokotos Defendants owed Lina fiduciary duties of care, loyalty, and good faith." (Id. ¶ 15.)

Based on Lina's own characterization of them and their alleged wrongful conduct, Thanasis and Diane Molokotos, were both deeply involved in the management and handling of Trust assets, worked in concert with Helen Molokotos, a signatory of the Trust, and acted in ways that violated the Trust Agreement. It is evident to the Court that Thanasis and Diane are "closely related" to the signatories, and are likewise bound by the forum selection clause of the Trust Agreement.[13] Accordingly, as all the claims and parties involved in this action are subject to the forum selection clause, the third Phillips prong is satisfied.

---

[13] As explained above, though she is a non-signatory to the Trust Agreement, Plaintiff is closely related to the signatories such that the forum selection clause likewise applies to her. (See supra Section II.B.2.)

4. Rebutting the Presumption of Enforceability

Because the first three prongs of the <u>Phillips</u> inquiry have been satisfied, the forum selection clause is presumptively enforceable. <u>See</u> <u>Phillips</u>, 494 F.3d at 383-84. The Court now turns to the final step to determine whether Plaintiff has rebutted the presumption of enforceability by making "a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" <u>Id.</u> (quoting <u>M/S Bremen</u>, 407 U.S. at 15).

Upon review of the full record, the Court finds that Plaintiff has not satisfied her burden of establishing that enforcement of the forum selection clause at issue would be unreasonable or unjust. As the clause provides for venue in the state courts of New York, proceeding with this action in state court would not overly burden the parties, nor would it raise any issues of fundamental unfairness that would warrant maintaining the action in this Court. Additionally, as discussed above, Plaintiff has not asserted that the forum selection clause was procured by fraud or overreaching, which would thereby invalidate the clause or make enforcement of the clause improper. The Court thus does not disturb the otherwise legitimate expectations of the parties with respect to this forum selection clause and finds that dismissal of

the case on this ground is warranted, as the Court is not a proper forum to litigate this action. Accordingly, the Court **GRANTS** Defendants' Letter Motion to dismiss the case because of improper venue under Rule 12(b)(3).

Further, upon a finding that venue is improper, a court may exercise its discretion by dismissing the case or transferring it to a proper venue. See Spiciarich v. Mexican Radio Corp., No. 14 Civ. 9009, 2015 WL 4191532, at *3 (S.D.N.Y. July 10, 2015) (citing Minnette v. Time Warner, 997 F.2d 1023, 1026 (2d Cir. 1993)); see also 28 U.S.C. § 1406(a). Thus, the Court hereby directs the Clerk of Court to enter an order dismissing this case by reason of improper venue, without prejudice to Plaintiff filing the action in the Supreme Court of the State of New York, New York County.

C.    FAILURE TO STATE A CLAIM

Defendants lastly argue that dismissal is appropriate under Rule 12(b)(6). Rule 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Defendants contend that the statute of limitations with respect to Penny Spanos has passed, and that Plaintiff has failed to state a claim on all claims because Penny Spanos was not a Trustee within the timeframe of the alleged wrongdoing. As the Court has determined that dismissal of this action is warranted due to

54

improper venue and the remaining issues go to the merits of the case, the Court declines to consider Defendants' remaining arguments under Rule 12(b)(6), and the Letter Motion to dismiss under Rule 12(b)(6) is **DENIED**.

### III. <u>ORDER</u>

For the reasons stated above, it is hereby

**ORDERED** that the letter motion (see Dkt. Nos. 35-1, 36-1) of defendants Thanasis Molokotos, Diane Vardakas Molokotos, Helen Stassinopoulos Molokotos, James Spanos, and Penny Spanos to dismiss the Amended Complaint (see Dkt. No. 28) filed by plaintiff Polyxeni (Lina) Molokotos-Liederman ("Plaintiff") is **GRANTED**, in part, and **DENIED**, in part. The motion is granted under Federal Rule of Civil Procedure 12(b)(3) for improper venue but denied under Rule 12(b)(1) for lack of subject matter jurisdiction, and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted; and it is further

**ORDERED** that such dismissal shall be without prejudice to Plaintiff filing the action in the Supreme Court of the State of New York, New York County ("State Court"). Should Plaintiff fail, without good cause shown, to file the action in State Court within twenty-one (21) days of the date of this Decision and Order, the Court's dismissal of the action shall be with prejudice.

55

The Clerk of Court is respectfully directed to terminate any pending motions and to close this case.


**SO ORDERED.**

Dated:    14 September 2023
          New York, New York

                                                    _____
                                                         Victor Marrero
                                                           U.S.D.J.